UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KEN SHIRLEY and AMPARO LARA, | ) | 1:08-cv-1274 OWW SMS |
| | ) | |
| Plaintiffs, | ) | SCHEDULING CONFERENCE ORDER |
| | ) | |
| v. | ) | Discovery Cut-Off: 3/5/10 |
| | ) | |
| LONG JOHN SILVER'S, INC., and | ) | Non-Dispositive Motion |
| DOES 1-100 inclusive, | ) | Filing Deadline: 3/19/10 |
| | ) | |
| Defendants. | ) | Dispositive Motion Filing |
| | ) | Deadline: 4/5/10 |
| _____ | ) | |

Settlement Conference Date:
3/17/10 10:00 Ctrm. 7

Pre-Trial Conference Date:
7/12/10 11:00 Ctrm. 3

Trial Date: 8/21/10 9:00
Ctrm. 3 (JT-10 days)

I.   Date of Scheduling Conference.

February 4, 2009.

II.   Appearances Of Counsel.

The Law Office of Dean B. Gordon by Dean B. Gordon, Esq.
appeared on behalf of Plaintiffs.

Phillips, Spallas & Angstadt LLP by Gregory L. Spallas,
Esq., and Burleson Cooke LLP by Andrea M. Johnson, Esq., appeared
on behalf of Defendant Long John Silver's, Inc.

1

III.   Summary of Pleadings.

   **Plaintiffs' Summary**

   1.   Ken Shirley worked for LJS for approximately 23 years, working his way up from cook to Area Coach/Area District Manager in charge of fourteen stores between Modesto and Bakersfield. Just prior to his termination, Plaintiff Ken Shirley was on approved leave while recovering from knee surgery due to a non-work related injury.  While off work, Plaintiff Ken Shirley's supervisor, Region Coach, Darren McGilbray, and the managers of two stores within Plaintiff Ken Shirley's district, shared his duties and responsibilities.

   2.   Amparo Lara worked for LJS for almost 10 years, working her way up from cook to Store Manager.  Plaintiff Ken Shirley promoted her to manager of the Porterville store in 2004.  In late April 2006, Plaintiff Amparo Lara became ill and needed some time off from work to recover.  During Plaintiff Amparo Lara's absence, Ken Shirley placed Team Leader, Noemi Ledesma, in charge of the Porterville store because of her previous performance as Acting Manager.

   3.   Both Plaintiff Ken Shirley and Plaintiff Amparo Lara were superior performers; rising through the ranks and turning around their stores.

   4.   Prior to Plaintiff Amparo Lara's illness, she and Plaintiff Ken Shirley had identified difficulties with the way the bank processed the Porterville store's deposits.  Plaintiff Amparo Lara and Plaintiff Ken Shirley had requested, but had not yet been granted permission to change banks because of these difficulties.

2

1    5.   While both Plaintiff Ken Shirley and Plaintiff Amparo

2    Lara were off work, the acting manager of the Porterville store

3    (#5245), Noemi Ledesma, began embezzling money.  Although both of

4    the people covering for Plaintiff Ken Shirley received multiple

5    e-mails from the Cash Handling Department indicating that

6    deposits may not have been made by the Porterville store, neither

7    of them acted upon this information.  After receiving the e-mails

8    from the Cash Handling Department for several days, and while

9    still off work, Plaintiff Ken Shirley, who had also been

10   receiving the e-mails at home, began forwarding the e-mails to

11   the Porterville store.  Each time, Plaintiff Ken Shirley received

12   credible assurance that the difficulty was the same problem

13   identified by Plaintiff Ken Shirley and Plaintiff Amparo Lara

14   before they took their leaves.  While still off work, Plaintiff

15   Ken Shirley even directed one of the people covering for him to

16   go to the Porterville store.  That person did not discover any

17   embezzlement or other wrongdoing.

18   6.   On his first day back to work, Plaintiff Ken Shirley

19   went to the Porterville store himself, and discovered that the

20   daily deposit log had not been completed for the previous two

21   weeks.  Plaintiff Ken Shirley reviewed the proper procedure for

22   completion of the deposit log with Ms. Ledesma and instructed her

23   to have the log updated by the time Plaintiff Amparo Lara was to

24   returned to work eight days later.

25   7.   On Plaintiff Amparo Lara's first day back to work, Ms.

26   Ledesma still had not updated the deposit log.  Therefore,

27   Plaintiff Ken Shirley and Plaintiff Amparo Lara reconstructed the

28   Bank Deposit Log and were able to account for all deposits except

3

1  for seven missing deposits totaling $9,792.99.  They quickly

2  determined that Ms. Ledesma had stolen the missing money.

3  Immediately after Ms. Ledesma was terminated, LJS turned on

4  Plaintiffs over things that took place while they were off work

5  on approved leave and others were supposed to be covering their

6  responsibilities.

7      Facts for Plaintiff Ken Shirley

8      8.    Ken Shirley worked for LJS for approximately 23 years,

9  working his way up from cook to Area Coach/Area District Manager

10  in charge of fourteen stores between Modesto and Bakersfield.

11  Just prior to his termination, Plaintiff Ken Shirley was on

12  approved leave while recovering from knee surgery due to a non-

13  work related injury.  While off work, Plaintiff Ken Shirley's

14  supervisor, Region Coach, Darren McGilbray, and the managers of

15  two stores within Plaintiff Ken Shirley's district shared his

16  duties and responsibilities.

17      9.    Plaintiff Ken Shirley was originally hired by LJS in

18  about March 1983 as a cook for the Clovis and Kings Canyon

19  Avenues restaurant in Fresno, California.  Because of his

20  superior work performance, he advanced through the ranks, and in

21  about May 1995, LJS promoted him to Area Coach/Area District

22  Manager in charge of fourteen stores between Modesto and

23  Bakersfield.  Altogether, Plaintiff Ken Shirley worked for LJS

24  for approximately 23 years and 5 months until LJS unlawfully

25  terminated him.  At all relevant times, Plaintiff Ken Shirley's

26  home base restaurant was in the County of Fresno, California.

27  LJS terminated Plaintiff Ken Shirley in the County of Fresno and

28  approximately one quarter of the restaurants he was responsible

4

1   for were in the County of Fresno.

2       10.   On or about November 26, 2005, Plaintiff Ken Shirley

3   was involved in a non-work related motorcycle accident in which

4   he injured one of his anterior cruciate ligaments (ACL).

5   Approximately one week after the accident, Plaintiff Ken

6   Shirley's doctor told him that he needed surgery, but that he

7   could postpone surgery until it was convenient for work.

8       11.   One of the LJS' business innovations is multi-brand

9   stores including various combinations of Taco Bell, LJS, A&W,

10   Pizza Hut, and Kentucky Fried Chicken.   The concept encourages

11   family or group dining because it offers a greater variety of

12   food than a single restaurant.   Although LJS staked its future on

13   this concept, Plaintiffs are informed and believe that many of

14   LJS' multi-brand stores were losing money.

15       12.   None of the management staff at any of the multi-brand

16   stores for which Plaintiff Ken Shirley was responsible had any

17   experience in opening a new store, and there was no store where

18   the staff could be trained because the nearest multi-brand LJS

19   and A&W store was in Bakersfield.   At about the time of Plaintiff

20   Ken Shirley's accident, LJS was planning to open its first multi-

21   brand store (LJS and A&W) in the Fresno area at Peach and Shaw

22   Avenues in Clovis, California.   It was very important to LJS that

23   Plaintiff Ken Shirley be present for the preparation of and the

24   opening of this store.   Therefore, for the convenience of his

25   employer, Plaintiff Ken Shirley agreed to postpone his surgery

26   until after the new store opened.

27       13.   On or about January 15, 2006, Store #5245 in

28   Porterville began having difficulties with the bank it was using

5

1   for cash deposits.  These difficulties revolved around the

2   specific way this bank processed deposits.  After investigating,

3   Plaintiff Ken Shirley determined that the most expedient solution

4   was to have this store change banks to another bank that would

5   process the deposits in a way that was compatible with LJS cash

6   management procedures.

7       14.  On or about March 22, 2006, Plaintiff Ken Shirley

8   requested approval to allow the Porterville store (#5245) to

9   change banks.  As of May 12, 2006, when Plaintiff Ken Shirley

10   took medical leave for his surgery, LJS still had not authorized

11   the change of banks for the Porterville store (#5245).

12       15.  On or about May 3, 2006, shortly after one of the most

13   successful openings in LJS history at the Clovis LJS-A&W store,

14   Plaintiff Ken Shirley's Region Coach, Darren McGilbray, granted

15   Plaintiff Ken Shirley permission to use vacation time for his ACL

16   surgery.  They agreed that Plaintiff Ken Shirley would be off

17   work from the day of surgery, May 12, 2006, through June 4, 2006,

18   and he would return to work on Monday, June 5, 2006.

19       16.  They also agreed that while Plaintiff Ken Shirley was

20   off work, Mike Olson, General Manager of the Bakersfield Rosedale

21   Highway store, and Robert Alcala, the General Manager of the

22   Fresno Cedar and Ventura store would assume Plaintiff Ken

23   Shirley's oversight responsibilities, and Mr. McGilbray would

24   oversee Mr. Olson and Mr. Alcala.

25       17.  LJS cash handling policies provided that all Cash

26   Discrepancy Notices for each store in the region (including

27   Porterville Store #5245) were simultaneously e-mailed by the bank

28   each day to three people: (1) Plaintiff Ken Shirley, the Area

1  Coach responsible for the store in question; (2) Mr. McGilbray,

2  the Region Coach responsible for the store in question; and (3)

3  Kevin Rice, LJS Loss Prevention Manager.

4     18.  Plaintiff Ken Shirley's surgery took place as scheduled

5  on May 12, 2006.  Since Plaintiff Ken Shirley was on approved

6  medical leave, he was not supposed to have any work

7  responsibilities, and he was confident that Mr. McGilbray, Mr.

8  Rice, Mr. Olson, and Mr. Alcala could handle his job duties while

9  he was on leave.

10    19.  Plaintiff Ken Shirley did not have any contact with

11 work for about one week after surgery.  Even though Plaintiff Ken

12 Shirley did not believe that he was required to check in or

13 monitor his e-mail since other LJS management were also receiving

14 them, he nonetheless looked at his e-mails on about May 22, 2006,

15 out of a sense of duty to his employer.

16    20.  Approximately one week after Plaintiff Ken Shirley

17 resumed monitoring his e-mail (beginning approximately May 29,

18 2006), he noticed that the cash department was sending Cash

19 Discrepancy Notices regarding Store #5245 in Porterville.

20 Plaintiff Ken Shirley knew that Mr. McGilbray and Loss Prevention

21 Manager Kevin Rice were also receiving the Cash Discrepancy

22 Notices for Store #5245.

23    21.  At that time, the Restaurant General Manager, Amparo

24 Lara, was also off work on disability leave.  She did not have

25 access to any company e-mails while she was off.  This store had

26 a history of receiving Cash Discrepancy Notices due to the way

27 the particular bank that store used, was validating the store's

28 deposits.  Therefore, Plaintiff Ken Shirley initially assumed

7

1  that these Cash Discrepancy Notices were a continuation of the

2  same difficulty with the bank, and not a cause for concern that

3  some employee might be embezzling cash.  Plaintiff Ken Shirley

4  also believed that Mr. McGilbray and/or Mr. Rice would take care

5  of any discrepancy, and correct any problems regarding Store

6  #5245 and/or the bank, since they both were receiving the same e-

7  mails and they both knew that Plaintiff Ken Shirley was out on

8  medical leave.

9       22.  After receiving Cash Discrepancy Notices for this same

10 store for approximately three days in a row, Plaintiff Ken

11 Shirley began forwarding the cash discrepancy notice e-mails to

12 that store.  Each time he forwarded one of these cash discrepancy

13 notice e-mails to Store #5245, the acting manager of that store

14 responded by advising him that there were no discrepancies, and

15 that the cash deposits were being made on time and in the proper

16 manner.

17      23.  Because of the number of Cash Discrepancy Notices

18 Plaintiff Ken Shirley had received regarding Store #5245 and that

19 Plaintiff Amparo Lara was off work at the same time, Plaintiff

20 Ken Shirley telephoned that store on about May 30, 2006, and

21 again on about June 2, 2006.  On each occasion, he was reassured

22 by the acting manager, Noemi Ledesma, that all was well with the

23 banking deposits and that the Cash Discrepancy Notices were due

24 to the manner in which the bank, that that particular store used,

25 validated cash deposits.

26      24.  Although Plaintiff Ken Shirley had no solid reason to

27 doubt Ms. Ledesma's response, out of an abundance of caution, on

28 about May 30, 2006, he telephoned Mike Olson, the Rosedale

**8**

1   Highway restaurant General Manager, (one of the two individuals

2   covering his responsibilities while he was gone) and asked Mr.

3   Olson to perform a site visit to see if he could determine what,

4   if anything, was wrong at Store #5245.   Plaintiff Ken Shirley

5   believes that Mr. Olson performed the requested visit while

6   Plaintiff Ken Shirley was on leave but that Mr. Olson did not

7   ascertain anything wrong with the cash bank deposits at that

8   store.

9        25.   Because of the continuing Cash Discrepancy Notices,

10  Plaintiff Ken Shirley had received regarding Store #5245, and

11  that Plaintiff Amparo Lara was still off work, on Plaintiff Ken

12  Shirley's first day back to work, on or about June 5, 2006, he

13  personally went to Store #5245 in Porterville.   During his visit,

14  all three lead personnel then running the store assured him that

15  the deposits were made correctly on time, and that there were no

16  known discrepancies with the bank deposits.

17       26.   However, because the deposit log had not been properly

18  filled out for the previous two weeks or so, it was impossible

19  for him to verify the accuracy of the bank cash deposits.

20  Plaintiff Ken Shirley reviewed the proper procedure for

21  completion of the Deposit Log with Ms. Ledesma and instructed her

22  to have the Deposit Log up to date by the time the Restaurant

23  General Manager, Amparo Lara, returned to work on June 13, 2006,

24  eight days later.   Plaintiff Ken Shirley further notified Ms.

25  Ledesma that she, Plaintiff Ken Shirley, and Plaintiff Amparo

26  Lara, would review the updated deposit log on Plaintiff Amparo

27  Lara's first day back to work, June 13, 2006.

28       27.   On or about June 12, 2006, one day prior to Plaintiff

9

1   Ken Shirley's scheduled meeting with Ms. Amparo and Ms. Ledesma
2   of Store #5245, Plaintiff Ken Shirley received a telephone call
3   from Region Coach/Regional V.P. Darren McGilbray regarding the
4   Cash Discrepancy Notices at Store #5245.  Plaintiff Ken Shirley
5   notified Mr. McGilbray of his earlier efforts to resolve this
6   situation and of his meeting scheduled for the following day with
7   Acting Manager Ledesma and returning restaurant General Manager
8   Lara.  Mr. McGilbray expressed satisfaction with Plaintiff Ken
9   Shirley's efforts to resolve this situation.

10       28.  Also on June 12, 2006, Plaintiff Ken Shirley spoke with
11  Human Resources Manager, Ipo Hoops, regarding the missing
12  deposits from Store #5245.  Mrs. Hoops indicated that she had
13  heard of the missing deposits from McGilbray and was glad
14  Plaintiff Ken Shirley had called her before she called him.
15  Plaintiff Ken Shirley told her he did not think there was an
16  issue, and would notify her of the results of the visit he had
17  scheduled the following day.  She was confident in Plaintiff Ken
18  Shirley's abilities and said to let her know if he needed
19  anything from her.  Mrs. Hoops and Plaintiff Ken Shirley stayed
20  in contact, weekly at minimum, from this day forward, but she
21  never visited the restaurant herself.  Prior to this incident,
22  they had only communicated on a monthly basis.  Later that day,
23  Plaintiff Ken Shirley spoke with Loss Prevention Manager, Kevin
24  Rice, about the Cash Discrepancy Notices regarding Store #5245.
25  He too seemed confident in Plaintiff Ken Shirley's approach to
26  the situation.

27       29.  The next day, on or about June 13, 2006, Plaintiff Ken
28  Shirley returned to Store #5245 and discovered that Acting

Manager Ledesma had not updated the bank deposit logs as instructed.  Therefore, Restaurant General Manager Lara and Plaintiff Ken Shirley reconstructed the Bank Deposit Log and were able to account for all deposits except for seven missing deposits totaling $9,792.99.  Throughout the previous day, Plaintiff Ken Shirley had also been in discussion with Loss Prevention Manager, Kevin Rice, regarding this situation.  On the same day, while Plaintiff Amparo Lara and Plaintiff Ken Shirley were reconstructing the Bank Deposit Log, Mr. Rice visited Store #5245.  Plaintiff Ken Shirley showed Mr. Rice what Plaintiff Amparo Lara and Plaintiff Ken Shirley were doing to resolve the situation.  Mr. Rice was comfortable with their efforts.

30.   The following day, June 14, 2006, Plaintiff Amparo Lara and Plaintiff Ken Shirley went to the bank to investigate whether they had any record of receiving deposits on the seven days in question.  The bank did not.  Therefore, Plaintiff Amparo Lara and Plaintiff Ken Shirley began interviewing the three Team Leaders who were responsible for running that store in Plaintiff Amparo Lara's absence.  It quickly became apparent that Ms. Ledesma had assumed full responsibility for all bank deposits during Plaintiff Amparo Lara's absence.  Ms. Ledesma had instructed the other two Team Leaders not to worry about the bank deposits, saying she would take care of them, or words to that effect.

31.   Further, Plaintiff Ken Shirley also telephoned the corporate cash department on several occasions in an effort to ensure that these deposits inadvertently had not been posted to a different restaurant or account.  Ultimately, the corporate cash

department, Plaintiff Amparo Lara and Plaintiff Ken Shirley were unable to account for any of the seven missing deposits totaling $9,792.99, and it became increasingly likely that Acting Manager Ledesma had embezzled these funds.

32.   On or about June 15, 2006, Plaintiff Ken Shirley contacted Loss Prevention Manager, Kevin Rice, and his supervisor, Mr. McGilbray and informed them of his suspicion that Acting Manager Ledesma had taken the missing deposits.

33.   Since the first day Plaintiff Ken Shirley spoke with Mr. McGilbray about this issue (June 12, 2006) Plaintiff Ken Shirley was also communicating with the Regional Human Resources Manager, Mrs. Ipo Hoops, about this issue.  In confidence and specifically "off the record," Mrs. Hoops repeatedly stated that this issue was not over and that Plaintiff Ken Shirley should not be at all comfortable because his job was in jeopardy because of the missing deposits no matter what Mr. McGilbray told Plaintiff Ken Shirley.  Because Mrs. Hoops repeated this warning, Plaintiff Ken Shirley addressed the matter several times with Mr. McGilbray over the remainder of his employment with Yum Brands/Long John Silver's.

34.   On June 19, 2006, Plaintiff Ken Shirley's supervisor, Mr. McGilbray, was in the Sacramento, California, office for meetings unrelated to the missing deposits.  On that same day, Plaintiff Ken Shirley was also in the Sacramento, California, office for a meeting unrelated to the missing deposits. Plaintiff Ken Shirley approached Mr. McGilbray between meetings. He did not raise the missing deposits from Store #5245.  When Plaintiff Ken Shirley raised the issue of the missing deposits,

1  Mr. McGilbray assured Plaintiff Ken Shirley that based on
2  Plaintiff Ken Shirley's actions and thorough follow-through on
3  this matter, that Plaintiff Ken Shirley was fine and not in
4  jeopardy of termination over this issue.  Mr. McGilbray returned
5  to Kansas with no further investigation or discussion of this
6  issue.

7      35.  As a regular part of Plaintiff Ken Shirley's weekly
8  routine, he had one-on-one telephone conversations with Mr.
9  McGilbray on Tuesdays.  During these weekly conversations, Mr.
10  McGilbray never brought up the issue of the missing deposits from
11  Store #5245.  Therefore, Plaintiff Ken Shirley regularly brought
12  up the issue of the missing deposits, as the warnings from Mrs.
13  Hoops continued.  Mr. McGilbray assured Plaintiff Ken Shirley
14  that this issue was not a threat to Plaintiff Ken Shirley's job
15  security.

16      36.  On or about June 26, 2007, Loss Prevention Manager,
17  Kevin Rice, called a meeting to meet in Porterville to terminate
18  Noemi Ledesma for failure to secure company funds.  On June 27,
19  2007, with the approval of Human Resources Manager, Ipo Hoops,
20  Mr. Rice and Plaintiff Ken Shirley terminated Ms. Ledesma.  After
21  terminating Ms. Ledesma, Mr. Rice turned his interrogation toward
22  Plaintiff Ken Shirley and his business practices.  It was
23  apparent he was not going to take the matter to the police as
24  they had previously discussed.  He asked Plaintiff Ken Shirley
25  questions regarding how Plaintiff Ken Shirley trained his team on
26  cash procedures, how he followed up on their training, and what
27  they could do as a region to ensure this would not recur, as
28  Plaintiff Ken Shirley was the second of three Area Coaches that

13

had multiple deposits disappear while Mr. McGilbray was their Region Coach.  Plaintiff Ken Shirley was concerned about cash handling from the initial training of all members of management and the commitment to daily follow-up.

37.  On or about July 13, 2006, Plaintiff Ken Shirley drove to Las Vegas, Nevada, for his mid-year review with Mr. McGilbray. Since Plaintiff Ken Shirley had been receiving conflicting messages from his immediate supervisor and human resources for several months, Plaintiff Ken Shirley looked forward to the opportunity to discuss his performance and to obtain a written performance evaluation.

38.  LJS uses a Balanced Score Card (BSC) to grade the performance of all operations staff from Assistant Restaurant Managers to the President of LJS.  Plaintiff Ken Shirley received a rating of 3.3 out of 5.0, which is "On Target."  Mr. McGilbray's Region BSC rating was 2.1 or "Below Target."  LJS's BSC rating was 2.5.  Significantly, Mr. McGilbray awarded Plaintiff Ken Shirley 4.15 out of 5.0 for leadership and he indicated that Plaintiff Ken Shirley had no significant areas in need of improvement.  As the conversation around Plaintiff Ken Shirley's evaluation began to wrap-up he changed gears and began to speak of his up coming two week vacation to Switzerland.  Mr. McGilbray was planning to leave Monday, July 17, 2006, and return on Monday, July 31, 2006.

39.  Plaintiff Ken Shirley was one of ten Area Coaches who reported directly to Mr. McGilbray.  Because of Plaintiff Ken Shirley's superior performance, LJS selected Plaintiff Ken Shirley to run the region while Mr. McGilbray was out of the

country in July 2006.  Plaintiff Ken Shirley believes Mr. McGilbray selected him to run the region in his absence, and that he did so with the approval of at least one level of management above him.  Between the time LJS selected Plaintiff Ken Shirley to fill in for Mr. McGilbray and the time of Mr. McGilbray's departure, Plaintiff Ken Shirley spoke with LJS President, Andy Rosen, who confirmed that he was aware of the fact that Plaintiff Ken Shirley was filling-in for Mr. McGilbray during McGilbray's vacation.

40.  Plaintiff Ken Shirley's additional responsibilities included, but were not limited to: running the region conference calls for Mr. McGilbray's nine other Area Coaches and 66 restaurants; leading the weekly multi-brand conference calls (a duty that Mr. McGilbray and Plaintiff Ken Shirley had shared for some months); presenting the region profit and loss statement for period 7 to LJS Head Coach (Vice President) and seven other Region Coaches; and handle whatever daily issues that arose.

41.  After a lengthy conversation about Mr. McGilbray's vacation plans, Plaintiff Ken Shirley turned the conversation back toward the issue of the missing deposits from Store #5245 as it had yet to be resolved.  Mr. McGilbray telephoned Loss Prevention Manager, Kevin Rice, and put him on speakerphone to discuss the matter.  In this telephone conversation, Plaintiff Ken Shirley learned that nothing had been done or even discussed since the day of Ms. Ledesma's termination June 26, 2006.

42.  Significantly, Mr. Rice had not given any of the evidence to the Porterville Police Department as he indicated he would prior to Ms. Ledesma's termination.  Further, Mr. Rice told

15

1  Mr. McGilbray that Store #5245 was following the security

2  procedures to the letter, and had no further issues with late

3  deposits.  Immediately after hanging up the phone, Mr. McGilbray

4  stood and paced about the room saying that he would have liked

5  Plaintiff Ken Shirley to have done things differently, but never

6  stated what he would have had Plaintiff Ken Shirley do.  He again

7  assured Plaintiff Ken Shirley that his future with LJS was

8  "fine."

9       43.  On Saturday, July 29, 2006, Mr. McGilbray phoned

10  Plaintiff Ken Shirley about 2:00 p.m., asking about the state of

11  the region during his vacation.  Plaintiff Ken Shirley told him

12  that one store in Plaintiff Ken Shirley's area had burned due to

13  fryer crumbs left overnight in a garbage can inside the

14  restaurant (exactly in accordance with company security policy)

15  and another store, not in Plaintiff Ken Shirley's area, had to be

16  permanently closed due to neglect of the air conditioners and

17  coolers.

18       44.  Seemingly uninterested by these two major items, and

19  after months of being disinterested in the stolen deposits from

20  Store #5245, Mr. McGilbray quickly turned the conversation to the

21  stolen deposits.  Mr. McGilbray informed Plaintiff Ken Shirley

22  that he would fly to California on Monday, July 31, 2006, or

23  Tuesday, August 1, 2006, to meet with terminated Team Leader

24  Ledesma.  Plaintiff Ken Shirley asked Mr. McGilbray if he wanted

25  him to arrange a meeting since Ms. Ledesma had been terminated

26  and it would be difficult to arrange a meeting with a previously

27  terminated employee at the last minute.  Mr. McGilbray stated

28  that that would not be necessary.

45.   On Sunday, July 30, 2006, Plaintiff Ken Shirley received an e-mail from Mr. McGilbray stating that he would fly into Fresno on Monday, July 31, 2006, in the afternoon but was not specific as to his arrival time.

46.   On Monday, July 31, 2006, at approximately 4:00 p.m., Plaintiff Ken Shirley received a telephone call from Mr. McGilbray saying he wanted to meet at the burned restaurant at the corner of Blackstone and Herndon, in Fresno, California. Plaintiff Ken Shirley informed Mr. McGilbray that Plaintiff Ken Shirley would meet him there in 20 minutes.   Plaintiff Ken Shirley arrived to find Mr. McGilbray and Human Resource Manager, Mrs. Hoops.   Plaintiff Ken Shirley asked Mrs. Hoops why she was there and her eyes began to water as she turned away from Plaintiff Ken Shirley.

47.   After some small talk, Mr. McGilbray handed Plaintiff Ken Shirley a document stating that Plaintiff Ken Shirley was being placed on administrative leave pending completion of Mr. McGilbray's and Mrs. Hoops' investigation into the stolen deposits at Store #5245 in Porterville, California.   Plaintiff Ken Shirley believes that Mr. McGilbray and Mrs. Hoops proceeded directly to Store #5245 in Porterville where they placed Plaintiff Amparo Lara (the store manager who had been on medical leave at the time of the embezzlement) on administrative leave pending completion of the same investigation.

48.   The next day, Tuesday, August 1, 2006, Mr. McGilbray and Mrs. Hoops terminated Plaintiff Ken Shirley's employment. Their stated reason for Plaintiff Ken Shirley's termination was "it was discovered that there were several Cash and Security

17

1    violations that occurred and that Plaintiff Ken Shirley was

2    negligent in failing to stop or correct these discrepancies in an

3    effective manner.   These violations include proper, prompt and

4    effective response to Cash Discrepancy Notices and failure to

5    correct Cash handling practices in management at 5245."

6        49.   Also, on August 1, 2006, Mr. McGilbray and Mrs. Hoops

7    terminated Plaintiff Amparo Lara.   The stated reason for

8    Plaintiff Amparo Lara's termination was as follows:

9        Shirley, your Area Coach.  During this investigation,
          you and he assumed that the late deposit trend was
10       because of a banking issue.  On and around June 12,
          2006, Kevin Rice, your Loss Prevention Manager,
11       conducted and [sic] investigation in regards to missing
          deposits in the amount of $9,792.99 that occurred at
12       your restaurant from May 16-May 25.  It was revealed in
          this investigation that there were several Cash Policy
13       violations in [sic] which you did not prevent from
          happening.  Documents like the deposit log were not
14       kept up per standard and deposits were not consistently
          being taken to the bank every day before open [sic].
15       It was determined that this was the cause of frequent
          late postings of the funds and the frequent CDNs.  You
16       failed to enforce Long John Silver's Cash Handling
          policy in your restaurant.  This ultimately resulted in
17       the amount of $9,792.99 to be unaccounted for."

18       50.   Plaintiff Ken Shirley is informed, believes, and

19    alleges that because less than 24 hours passed between the time

20    Plaintiff Amparo Lara and Plaintiff Ken Shirley were placed on

21    administrative leave pending an investigation into the cash

22    losses; placing him on administrative leave was a pretext and

23    that the real reason(s) for placing him on administration leave

24    and for terminating him were that:

25          a.   LJS perceived and/or regarded Plaintiff Ken

26    Shirley to be at least temporarily disabled;

27          b.   Cash handling discrepancies arose at Store #5245

28    during Plaintiff Ken Shirley's temporary disability leave, and

1  Mr. McGilbray and/or Mr. Rice failed and refused to perform
2  Plaintiff Ken Shirley's cash oversight duties during Plaintiff
3  Ken Shirley's temporary disability leave, as LJS was required and
4  agreed to do;

5          c.   Because of McGilbray's and/or Mr. Rice's failure
6  and refusal to perform the cash oversight functions normally
7  assigned to Plaintiff Ken Shirley (but which were temporarily
8  assigned to them during Plaintiff Ken Shirley's disability leave)
9  that LJS suffered a much greater financial loss than it would
10 have been if Mr. McGilbray and/or Mr. Rice had performed the
11 duties temporarily assigned to them in a diligent, competent, and
12 professional manner;

13         d.   Retaliation for Plaintiff Ken Shirley's
14 complaining about being held responsible for activities that took
15 place while he was on temporary disability leave; and to cover
16 Mr. McGilbray's negligent failures and refusals to act when given
17 multiple notices that the cash handling problem at Store #5245
18 existed during the period of time when it was Mr. McGilbray's
19 direct responsibility (and not Plaintiff Ken Shirley's) to
20 investigate the cash handling discrepancies at Store #5245 in
21 Porterville, California; and

22         e.   Because Plaintiff Ken Shirley is over 40 years old
23 and LJS wanted to replace him with a younger less experienced
24 person that it could pay less.

25     51.   Following Plaintiff Ken Shirley's termination, the
26 parent company, Yum Brands, sold its LJS division to one of its
27 franchisees, Apex Management Company.  In recognition of
28 Plaintiff Ken Shirley's long-time superior performance and

1  knowledge of the business and this specific territory, the owner,

2  Tabbassum Mumtaz, sought out Plaintiff Ken Shirley and hired him

3  as its Director of Operations for the 23 California restaurants

4  Apex/Mr. Mumtaz had just purchased.

5      52.   In effect, Plaintiff Ken Shirley now has his former

6  boss's job.  Since Apex Management Company hired Plaintiff Ken

7  Shirley, he has continued to perform at his usual excellent

8  level.

9          Facts for Plaintiff Amparo Lara

10     53.   Amparo Lara is a Hispanic female.  LJS hired her on or

11  about December 5, 1996, as a cook for the LJS restaurant located

12  at 3200 South Mooney Boulevard, in Visalia, California.  Because

13  of her superior work performance, she advanced through the ranks

14  until, on about December 9, 2004, her Area Coach, Plaintiff Ken

15  Shirley, promoted her to the position of Store Manager, assigning

16  her to the store located at 596 West Olive Avenue in Porterville,

17  California, where she worked until she was unlawfully terminated.

18     54.   Plaintiff Amparo Lara performed her duties in a

19  diligent, competent and professional manner and always acted in

20  the best interest of her employer.  In Plaintiff Amparo Lara's

21  first year as Manager of Store 5245, she turned the store around.

22  The year before Plaintiff Amparo Lara took over Store 5245 lost

23  approximately $18,000.

24     55.   In Plaintiff Amparo Lara's first year, Store 5245 made

25  a small profit.  Further, Plaintiff Amparo Lara received at least

26  two written performance evaluations during her tenure as manager

27  of Store #5245.  Plaintiff Amparo Lara believes that she was

28  rated as being "On Target" on both her written performance

1  evaluations.

2  56.  Plaintiff Amparo Lara believes that many of the
3  managerial decisions regarding her employment, specifically
4  including but not limited to: her promotion to store manager,
5  direct supervisory oversight of the operation of the Porterville
6  store; supervisory oversight regarding the bank deposits at
7  issue, and possibly the decision to terminate her employment took
8  place in the City and County of Fresno, California.

9  57.  On about January 15, 2006, store #5245 in Porterville
10  began having difficulties with the bank it was using for cash
11  deposits.  After investigating, Plaintiff Amparo Lara and her
12  Supervisor, Ken Shirley, determined that this store should change
13  banks to one that would process the deposits in a way that was
14  compatible with LJS cash handling procedures.

15  58.  On or about March 22, 2006, Plaintiff Amparo Lara and
16  her immediate supervisor, Ken Shirley, requested approval from
17  the corporate office to allow store #5245 to change banks.  LJS
18  corporate had not yet approved the change of banks for store
19  #5245 by the time that Plaintiff Amparo Lara became ill in late
20  April 2006.

21  59.  During the week of April 20, 2006, Plaintiff Amparo
22  Lara began feeling ill and had difficulty speaking.  Plaintiff
23  Amparo Lara's doctor ordered her to take a week off from work to
24  rest and recover from her illness.

25  60.  Plaintiff Amparo Lara's physician scheduled a follow-up
26  appointment for May 5, 2006, and told Plaintiff Amparo Lara that
27  if she were not better by her May 5, 2006 appointment, that she
28  would have to take additional time off to recover from her

1  illness.   Plaintiff Amparo Lara immediately notified her
2  supervisor, Ken Shirley, and arranged to cover her
3  responsibilities at Store #5245 and to use her accrued vacation
4  time for the week off work.

5      61.   Plaintiff Amparo Lara returned to work after her
6  initial time off due to illness and everything was fine.   Ms.
7  Noemi Ledesma had handled the daily cash deposits properly, and
8  no major issues had arisen during Plaintiff Amparo Lara's
9  absence.

10     62.   In light of the above warning by Plaintiff Amparo
11 Lara's doctor, it became apparent that Plaintiff Amparo Lara's
12 doctor might require her to take additional time off work
13 starting at about the time of her follow-up appointment scheduled
14 for May 5, 2006.   Plaintiff Amparo Lara notified her supervisor,
15 Plaintiff Ken Shirley of this likelihood.   Therefore, on or about
16 May 1, 2006, Plaintiff Ken Shirley, called a meeting to prepare
17 the Team Leaders of Store #5245 for Plaintiff Amparo Lara's
18 anticipated time off due to her illness.

19     63.   Ms. Ledesma had worked at Store #5245 prior to
20 Plaintiff Amparo Lara's arrival.   During that time, Ms. Ledesma
21 had covered for her previous manager.   Plaintiff Amparo Lara
22 believes that during that time, Ms. Ledesma had done a good job
23 of covering for her then-manager.   Because Ms. Ledesma was
24 attending school in the evenings, she had been regularly
25 scheduled to work mornings.   Ms. Ledesma regularly handled the
26 bank deposits, which were made each morning.   Therefore, Ms.
27 Ledesma had significant experience with preparing the bank
28 deposits and the associated paperwork and Ms. Ledesma had shown

1  herself to be competent and trustworthy with the cash handling
2  procedures.

3       64.  During her time off work during her illness, Plaintiff
4  Amparo Lara took it upon herself to communicate with Ms. Ledesma
5  in an attempt to ensure that Store #5245 was managed properly in
6  Plaintiff Amparo Lara's absence.  Every time Plaintiff Amparo
7  Lara spoke with Ms. Ledesma, Ms. Ledesma had questions but
8  reasonably appeared to have things under control in Plaintiff
9  Amparo Lara's absence.

10      65.  After Plaintiff Ken Shirley injured his knee while off
11 duty, which required surgery that had previously been scheduled
12 for the same time as Plaintiff Amparo Lara's second illness-
13 related time off (May 5-June 13, 2006).

14      66.  Plaintiff Amparo Lara believes that Plaintiff Ken
15 Shirley had assigned his oversight responsibilities to Mike
16 Olson, General Manager of the Rosedale Highway store in
17 Bakersfield and Robert Alcala, the General Manager of the store
18 at Cedar and Ventura in Fresno.  Both were very experienced
19 managers, more than capable of handling any question or
20 difficulty that Ms. Ledesma might have encountered during
21 Plaintiff Amparo Lara's approximately five weeks off work.

22      67.  Further, Plaintiff Ken Shirley's supervisor, Darren
23 McGilbray, was aware of and had approved all of the above
24 arrangements and decisions regarding Plaintiff Amparo Lara's
25 second absence due to illness and Mr. McGilbray was aware of and
26 had approved all of the above arrangements and decisions
27 regarding Plaintiff Ken Shirley's medically related absence.

28      68.  Beginning on about May 16, 2006, eleven days after

23

Plaintiff Amparo Lara and her Immediate Supervisor, Ken Shirley
were both off work, bank deposits at Store #5245 started missing.

69.   The first missing bank deposit was from May 16, 2006.
Plaintiff Amparo Lara believes that Company policy required the
Cash Handling Department to send an e-mail to the Loss Prevention
Department, the Area Coach, and the Region Coach of any store
with a bank deposit that could not be verified within the time
allotted by Company policy.  Plaintiff Amparo Lara is informed,
believes, and alleges that the Cash Handling Department began
sending e-mails regarding the missing deposits for Store #5245 on
or about May 17, 2006.

70.   Plaintiff Amparo Lara is informed, believes, and
alleges that Plaintiff Ken Shirley began forwarding the e-mails
from the Cash Handling Department to Ms. Ledesma on approximately
May 31, 2006.  Plaintiff Amparo Lara is informed, believes, and
alleges that, on or about May 31, Plaintiff Ken Shirley began
telephoning Ms. Ledesma and inquiring about the missing bank
deposits.  Apparently, Ken Shirley was initially satisfied with
Ms. Ledesma's initial explanation regarding the missing bank
deposits.

71.   On or about June 12, 2006, in one of their twice-daily
telephone calls, Ms. Ledesma first told Plaintiff Amparo Lara
that bank deposits were missing and that Ms. Ledesma had been
receiving e-mails forwarded from Plaintiff Ken Shirley from the
Cash Handling Department to that effect.

72.   At that time, Ms. Ledesma was aware of approximately
seven missing bank deposits.  However, this was the first time
that Plaintiff Amparo Lara became aware of the missing bank

24

1  deposits, as Plaintiff Amparo Lara did not receive any e-mails
2  while she was off because she did not have a computer at home.

3  73.  When Plaintiff Amparo Lara became aware of the missing
4  bank deposits, she immediately insisted upon returning to work
5  the next day despite her doctor's refusal to release her.  Left
6  with no choice, Plaintiff Ken Shirley agreed to meet with
7  Plaintiff Amparo Lara at Store #5245 on June 13, 2006.

8  74.  On her first day back to work, on or about June 13,
9  2006, Plaintiff Amparo Lara met with Plaintiff Ken Shirley at
10 Store #5245 in an effort to resolve the mystery of the missing
11 bank deposits.  After being initially unable to locate the
12 missing deposits, Plaintiff Amparo Lara telephoned Ms. Ledesma
13 and requested that Ms. Ledesma meet Plaintiffs at Store #5245.

14 75.  When Ms. Ledesma arrived at Store #5245, it was
15 apparent that Ms. Ledesma had not been: (1) properly filling out
16 the Daily Deposit Log; (2) properly filling out the Daily Red
17 Book; (3) storing the original bank deposit slips in the proper
18 location within Store #5245; and (4) sending copies of the bank
19 deposit slips to the corporate Cash Handling Department.

20 76.  On or about June 14, 2006, Plaintiff Amparo Lara and
21 Plaintiff Ken Shirley went to the bank to investigate whether
22 they had any record of receiving deposits on the seven days in
23 question.  The bank did not.

24 77.  After returning from the bank, Plaintiff Amparo Lara
25 and Plaintiff Ken Shirley began interviewing the four Team
26 Leaders who were responsible for running that store in Plaintiff
27 Amparo Lara's absence.  It quickly became apparent that Ms.
28 Ledesma had assumed full responsibility for all bank deposits

1    during Plaintiff Amparo Lara's absence.  Ms. Ledesma had

2    instructed the other two day time Team Leaders not to worry about

3    the bank deposits, saying she would take care of them or words to

4    that effect.

5        78.  Substantial evidence developed that Ms. Ledesma had

6    embezzled the cash instead of depositing it into the appropriate

7    bank account, including that Ms. Ledesma had insisted on assuming

8    control of the bank deposits, the condition of the Daily Deposit

9    Log; the condition of the Daily Red Book; and the condition of

10   the original bank deposit slips coupled with the information

11   obtained in the interviews of the other Team Leaders.

12       79.  Later that same day, on or about June 14, 2006, the

13   Loss Prevention Manager, Kevin Rice, visited Store #5245 and met

14   with Plaintiff Amparo Lara and Plaintiff Ken Shirley.  Plaintiff

15   Ken Shirley showed Mr. Rice what he and Plaintiff Amparo Lara

16   were doing to resolve the situation.  Mr. Rice was comfortable

17   with their efforts and left the task to Plaintiff Ken Shirley and

18   Plaintiff Amparo Lara for the moment.

19       80.  After the meeting with Mr. Rice, Plaintiffs

20   communicated almost daily with each other regarding the missing

21   bank deposits.  However, Amparo Lara heard nothing more from

22   anyone from the corporate office or the Loss Prevention

23   Department about this issue.

24       81.  Plaintiff Amparo Lara is informed, believes, and

25   alleges that on or about June 26, 2006, Mr. Rice and Plaintiff

26   Ken Shirley placed Ms. Ledesma on administrative leave.

27   Plaintiff Amparo Lara believes that Ms. Ledesma was terminated on

28   or about July 10, 2006.

82.   On or about July 31, 2006, Region Coach/Regional V.P., Darren McGilbray and Human Resources Manager, Ipo Hoops, placed Plaintiff Amparo Lara on administrative leave, pending completion of the investigation.

83.   On or about August 1, 2006, Plaintiff Amparo Lara received a telephone call from Mrs. Hoops requesting that Plaintiff Amparo Lara meet Mrs. Hoops and Mr. McGilbray at a local restaurant.  When Plaintiff Amparo Lara arrived, Mrs. Hoops began crying.  Both Mrs. Hoops and Mr. McGilbray stated that Plaintiff Amparo Lara had done a good job and that they wished they did not have to fire her, but that they said they had no choice in the matter.

84.   The year before Plaintiff Amparo Lara took over the Porterville store, it lost approximately $18,000.  In the first year after Plaintiff Amparo Lara took over the Porterville store, it made money.  Further, at the time of her termination, Plaintiff Amparo Lara was on track to make the Porterville store even more profitable.

85.   Additionally, the Porterville store was still having difficulties more than a year after Plaintiff Amparo Lara's termination when Apex Management Company bought the local LJS stores from Yum Brands.  Mike Olson, the Apex District Manager for the district, including the Porterville store, recognized the difficulties the Porterville store was having and heard the stories of Plaintiff Amparo Lara turning that store around; therefore, Mr. Olsen re-hired Plaintiff Amparo Lara and returned her to her former position as manager of the Porterville store, where she continues to excel.

1    IV.   Orders Re Amendments To Pleadings.

2        1.   Defendant has moved to dismiss.  Plaintiffs have no

3    objection to Defendant's motion to dismiss Darren McGilbray,

4    therefore Darren McGilbray is ORDERED DISMISSED as a party from

5    this lawsuit by this scheduling order.

6        2.   Plaintiffs do not intend to add any additional parties

7    at this time.  However, discovery is just beginning and

8    additional individual employees of defendants may be added as

9    parties to this action when their identity is revealed through

10   discovery.

11   V.   Factual Summary.

12       A.   Admitted Facts Which Are Deemed Proven Without Further

13   Proceedings.

14       1.   Plaintiffs are individual residents of the Eastern

15   District of California, Fresno Division.

16       2.   Long John Silver's Inc., is a corporation with its

17   principal place of business in the State of Kentucky and is

18   incorporated in a state other than California.

19       3.   The Defendant has invoked the diversity

20   jurisdiction of the Court.

21       4.   Ken Shirley was employed by Long John Silver's in

22   various capacities over the period of time alleged in the

23   complaint.

24       5.   Plaintiff, Amparo Lara, was also employed by Long

25   John Silver's at various times alleged in the complaint.

26       6.   Both Plaintiffs were terminated from their

27   employment with Long John Silver's August 1, 2006.

28       7.   At the time of termination. Mr. Shirley was an

                                28

1   Area Coach for Long John Silver's.

2        8.   At the time of her termination, Ms. Lara was a

3   restaurant manager at the Porterville Long John Silver's

4   restaurant.

5       B.   Contested Facts.

6       1.   Defendant denies the allegations of Plaintiffs.

7   LJS terminated the employment relationship with Plaintiffs as a

8   result of cash handling problems that arose at the Porterville

9   restaurant, which Plaintiff Lara managed.  Cash handling is

10   critical to LJS' business, a matter these Plaintiffs were well

11   aware of.  Cash handling concerns had been an on-going, unabated

12   issue at the Porterville restaurant for many months.  Plaintiff

13   Lara, the restaurant manager, and her supervisor, Plaintiff

14   Shirley, had direct responsibility for cash handling at the

15   Porterville restaurant.  In particular, Plaintiff Shirley had

16   responsibility for training and overseeing that restaurant

17   (including its cash handling processes) and its employees and, in

18   particular, Plaintiff Lara, who was his direct report.  In short,

19   the Plaintiffs jointly bore responsibility for the Porterville

20   restaurant's cash handling problems, and thus these terminations

21   followed.  These employment terminations occurred in accordance

22   with company policy and practice, applied across the board, and

23   the terminations took place after lengthy investigation and were

24   in no way related to any leave or other time off that Plaintiffs

25   may have taken in 2006.  In short, the terminations were not

26   motivated by illegal discriminatory motive.

27   ///

28   ///

1   VI.   Legal Issues.

2         A.   Uncontested.

3              1.   Jurisdiction exists under 28 U.S.C. § 1332, based

4   on the diverse citizenship of the parties and the amount in

5   controversy.   The supplemental jurisdiction of the Court is

6   invoked under 28 U.S.C. § 1367.

7              2.   Venue is proper under 28 U.S.C. § 1391.

8              3.   The parties agree that the substantive law of the

9   State of California provides the rule of decision in this

10  diversity action.

11             4.   The parties are not in agreement as to whether an

12  arbitration agreement between them compels arbitration as a

13  matter of law.

14        B.   Contested.

15             Plaintiff asserts the following claims:

16             1.   This complaint contains a first cause of action

17  for age discrimination in violation of the California Fair

18  Employment and Housing Act, California Government Code §§ 12900,

19  12921, 12926, 12940, 12941, and 12965 as to Defendant Long John

20  Silver's.

21             2.   A second cause of action for gender, race, color,

22  national origin discrimination in violation of the California

23  Fair Employment and Housing Act, California Government Code

24  §§ 12900, 12921, 12926, 12940, 12941, and 12965 as to Defendant

25  Long John Silver's.

26             3.   A third cause of action for disability

27  discrimination in violation of the California Fair Employment and

28  Housing Act, California Government Code §§ 12900, 12921, 12926,

30

1 | 12940, 12941, and 12965, as to all defendants.

2 |       4.   A fourth cause of action for violation of the
3 | California Family Rights Act portion of the California Fair
4 | Employment and Housing Act, California Government Code §§ 12900,
5 | 12921, 12926, 12940, 12941, 12945, 12945.2 and 12965, as to all
6 | defendants.

7 |       5.   A fifth cause of action for failure to engage in
8 | interactive process portion of the California Fair Employment and
9 | Housing Act, California Government Code §§ 12900, 12921, 12926,
10 | 12940, 12941, and 12965, as to Defendant Long John Silvers.

11 |       6.   A sixth cause of action for failure to provide
12 | reasonable accommodations in violation of the California Fair
13 | Employment and Housing Act, California Government Code §§ 12900,
14 | 12921, 12926, 12940, 12941, and 12965, as to Defendant Long John
15 | Silver's.

16 |       7.   A seventh cause of action for racial/color/
17 | gender/disability/age harassment in violation of the California
18 | Fair Employment and Housing Act, California Government Code
19 | §§ 12900, 12921, 12926, 12940, 12941, and 12965, as to all
20 | defendants.

21 |       8.   An eighth cause of action for failure to take all
22 | reasonable steps to prevent discrimination and retaliation in
23 | violation of the California Fair Employment and Housing Act,
24 | California Government Code §§ 12900, 12921, 12926, 12940, 12941,
25 | and 12965, as to defendant Long John Silver's.

26 |       9.   A ninth cause of action for retaliation for
27 | complaints and protestation of discrimination in violation of the
28 | California Fair Employment and Housing Act, California Government

1  Code §§ 12900, 12921, 12926, 12940, 12941, and 12965, as to
2  defendant Long John Silver's.

3       10.   A tenth cause of action for retaliation under the
4  California Family Rights Act portion of the California Fair
5  Employment and Housing Act, California Government Code §§ 12900,
6  12921, 12926, 12940, 12941, and 12965, as to defendant Long John
7  Silver's.

8       **Defendant's**

9       1.   Defendant denies all the charging allegations by
10 Plaintiffs.  Defendant specifically notes that Mr. McGilbray has
11 never been served with this lawsuit, to Defendant LJS's
12 knowledge.  Accordingly, the only known Defendant that is a
13 served party is LJS, which is represented by Ms. Johnson and Mr.
14 Spallas.  Additionally, Defendant notes that Plaintiffs are
15 subject to mandatory arbitration, and Defendant will file a
16 motion to compel arbitration.  Defendant asserts that it acted in
17 good faith, without malice or intentional discrimination at all
18 times, and that certain of Plaintiff's claims are subject to
19 dismissal for failure to state a claim upon which relief may be
20 granted (for example, Plaintiff's harassment and retaliation
21 claims).  Defendant further asserts that Plaintiffs failed to
22 mitigate their damages.

23 VII. Consent to Magistrate Judge Jurisdiction.

24      1.   The parties have not consented to transfer the
25 case to the Magistrate Judge for all purposes, including trial.
26 VIII.    Corporate Identification Statement.

27      1.   Any nongovernmental corporate party to any action in
28 this court shall file a statement identifying all its parent

                            **32**

corporations and listing any entity that owns 10% or more of the party's equity securities.  A party shall file the statement with its initial pleading filed in this court and shall supplement the statement within a reasonable time of any change in the information.

IX.  Discovery Plan and Cut-Off Date.

1.    The parties agree that the disclosures required under Fed. R. Civ. P. 26(a) will be provided to each other no later than 28 days after the Scheduling Conference, or March 4, 2009.

2.    No changes are currently proposed as to limitations on discovery imposed under Fed. R. Civ. P. 30, 31, and/or 33.

3.    The parties believe that discovery will be needed on the nature and extent of plaintiffs' damages.  Discovery will also be needed concerning the facts that gave rise to the lawsuit including, but not limited to, testimony from employees of defendants who have percipient knowledge as to the policy and procedure of Long John Silver's banking and cash handling procedures, and supervision regarding these policies.

4.    The parties are ordered to complete all non-expert discovery on or before March 5, 2010.

5.    The parties are directed to disclose all expert witnesses, in writing, on or before December 1, 2009.  Any rebuttal or supplemental expert disclosures will be made on or before January 15, 2010.  The parties will comply with the provisions of Federal Rule of Civil Procedure 26(a)(2) regarding their expert designations.  Local Rule 16-240(a) notwithstanding, the written designation of experts shall be made pursuant to F. R. Civ. P. Rule 26(a)(2), (A) and (B) and shall include all

1  information required thereunder.  Failure to designate experts in

2  compliance with this order may result in the Court excluding the

3  testimony or other evidence offered through such experts that are

4  not disclosed pursuant to this order.

5      6.    The parties are ordered to complete all discovery,

6  including experts, on or before March 5, 2010.

7      7.    The provisions of F. R. Civ. P. 26(b)(4) shall

8  apply to all discovery relating to experts and their opinions.

9  Experts may be fully prepared to be examined on all subjects and

10 opinions included in the designation.  Failure to comply will

11 result in the imposition of sanctions.

12 X.    Pre-Trial Motion Schedule.

13     1.    All Non-Dispositive Pre-Trial Motions, including any

14 discovery motions, will be filed on or before March 19, 2010, and

15 heard on April 23, 2010, at 9:00 a.m. before Magistrate Judge

16 Sandra M. Snyder in Courtroom 7.

17     2.    In scheduling such motions, the Magistrate

18 Judge may grant applications for an order shortening time

19 pursuant to Local Rule 142(d).  However, if counsel does not

20 obtain an order shortening time, the notice of motion must comply

21 with Local Rule 251.

22     3.    All Dispositive Pre-Trial Motions are to be

23 filed no later than April 5, 2010.  Plaintiffs shall have thirty

24 (30) days to respond, through and including May 5, 2009, and

25 those motions will be heard on June 7, 2010, at 10:00 a.m. before

26 the Honorable Oliver W. Wanger, United States District Judge, in

27 Courtroom 3, 7th Floor.  In scheduling such motions, counsel

28 shall comply with Local Rule 230.

34

XI.   Pre-Trial Conference Date.

     1.   July 12, 2010, at 11:00 a.m. in Courtroom 3, 7th Floor, before the Honorable Oliver W. Wanger, United States District Judge.

     2.   The parties are ordered to file a Joint Pre-Trial Statement pursuant to Local Rule 281(a)(2).

     3.   Counsel's attention is directed to Rules 281 and 282 of the Local Rules of Practice for the Eastern District of California, as to the obligations of counsel in preparing for the pre-trial conference.   The Court will insist upon strict compliance with those rules.

XII. Motions - Hard Copy.

     1.   The parties shall submit one (1) courtesy paper copy to the Court of any motions filed that exceed ten pages and any motions that have exhibits attached.   Exhibits shall be marked with <u>protruding numbered or lettered tabs</u> so that the Court can easily identify such exhibits.

XIII.   Trial Date.

     1.   August 24, 2010, at the hour of 9:00 a.m. in Courtroom 3, 7th Floor, before the Honorable Oliver W. Wanger, United States District Judge.

     2.   This is a jury trial.

     3.   Counsels' Estimate Of Trial Time:

          a.   7-10 days.

     4.   Counsels' attention is directed to Local Rules of Practice for the Eastern District of California, Rule 285.

XIV. Settlement Conference.

     1.   A Settlement Conference is scheduled for March 17,

35

1  2010, at 10:00 a.m. in Courtroom 7 before the Honorable Sandra M.
2  Snyder, United States Magistrate Judge.

3       2.    Unless otherwise permitted in advance by the
4  Court, the attorneys who will try the case shall appear at the
5  Settlement Conference with the parties and the person or persons
6  having full authority to negotiate and settle the case on any
7  terms at the conference.

8       3.    Permission for a party [not attorney] to attend
9  by telephone may be granted upon request, by letter, with a copy
10 to the other parties, if the party [not attorney] lives and works
11 outside the Eastern District of California, and attendance in
12 person would constitute a hardship.  If telephone attendance is
13 allowed, the party must be immediately available throughout the
14 conference until excused regardless of time zone differences.
15 Any other special arrangements desired in cases where settlement
16 authority rests with a governing body, shall also be proposed in
17 advance by letter copied to all other parties.

18      4.    Confidential Settlement Conference Statement.
19 At least five (5) days prior to the Settlement Conference the
20 parties shall submit, directly to the Magistrate Judge's
21 chambers, a confidential settlement conference statement.  The
22 statement should not be filed with the Clerk of the Court nor
23 served on any other party.  Each statement shall be clearly
24 marked "confidential" with the date and time of the Settlement
25 Conference indicated prominently thereon.  Counsel are urged to
26 request the return of their statements if settlement is not
27 achieved and if such a request is not made the Court will dispose
28 of the statement.

1          5.    The Confidential Settlement Conference

2    Statement shall include the following:

3               a.    A brief statement of the facts of the

4    case.

5               b.    A brief statement of the claims and

6    defenses, i.e., statutory or other grounds upon which the claims

7    are founded; a forthright evaluation of the parties' likelihood

8    of prevailing on the claims and defenses; and a description of

9    the major issues in dispute.

10              c.    A summary of the proceedings to date.

11              d.    An estimate of the cost and time to be

12   expended for further discovery, pre-trial and trial.

13              e.    The relief sought.

14              f.    The parties' position on settlement,

15   including present demands and offers and a history of past

16   settlement discussions, offers and demands.

17   XV.   Request For Bifurcation, Appointment Of Special Master,

18   Or Other Techniques To Shorten Trial.

19        1.    Any requests shall be addressed by non-dispositive

20   motion.   In the event punitive damages are sought, the amount of

21   punitive damages, if any, shall be tried in a second phase in a

22   continuous trial before the same jury after liability and the

23   entitlement to punitive damages has been established in the first

24   phase.

25   XVI. Related Matters Pending.

26        1.    There are no related matters.

27   XVII.      Compliance With Federal Procedure.

28        1.    The Court requires compliance with the Federal

37

1  Rules of Civil Procedure and the Local Rules of Practice for the

2  Eastern District of California.  To aid the court in the

3  efficient administration of this case, all counsel are directed

4  to familiarize themselves with the Federal Rules of Civil

5  Procedure and the Local Rules of Practice of the Eastern District

6  of California, and keep abreast of any amendments thereto.

7  XVIII.    Effect Of This Order.

8       1.    The foregoing order represents the best

9  estimate of the court and counsel as to the agenda most suitable

10 to bring this case to resolution.  The trial date reserved is

11 specifically reserved for this case.  If the parties determine at

12 any time that the schedule outlined in this order cannot be met,

13 counsel are ordered to notify the court immediately of that fact

14 so that adjustments may be made, either by stipulation or by

15 subsequent scheduling conference.

16      2.    Stipulations extending the deadlines contained

17 herein will not be considered unless they are accompanied by

18 affidavits or declarations, and where appropriate attached

19 exhibits, which establish good cause for granting the relief

20 requested.

21      3.    Failure to comply with this order may result in

22 the imposition of sanctions.

23

24

25 IT IS SO ORDERED.

26 Dated:    February 5, 2009              /s/ Oliver W. Wanger
                                       UNITED STATES DISTRICT JUDGE

27

28