UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEN SHIRLEY and AMPARO LARA,<br><br>            Plaintiffs,<br><br>    v.<br><br>LONG JOHN SILVER'S, INC., and<br>DOES 1-100 inclusive,<br><br>            Defendants.<br>_____ | 1:08-cv-1274 OWW SMS<br><br>AMENDED SCHEDULING<br>CONFERENCE ORDER<br><br>Discovery Cut-Off: 3/5/10<br><br>Non-Dispositive Motion<br>Filing Deadline: 3/19/10<br><br>Dispositive Motion Filing<br>Deadline: 4/5/10<br><br>Settlement Conference Date:<br>3/17/10 10:00 Ctrm. 7<br><br>Pre-Trial Conference Date:<br>7/12/10 11:00 Ctrm. 3<br><br>Trial Date: 8/24/10 9:00<br>Ctrm. 3 (JT-10 days) |

I.   Date of Scheduling Conference.

     February 4, 2009.

II.  Appearances Of Counsel.

     The Law Office of Dean B. Gordon by Dean B. Gordon, Esq.

appeared on behalf of Plaintiffs.

     Phillips, Spallas & Angstadt LLP by Gregory L. Spallas,

Esq., and Burleson Cooke LLP by Andrea M. Johnson, Esq., appeared

1

on behalf of Defendant Long John Silver's, Inc.

III.  Summary of Pleadings.

**Plaintiffs' Summary**

1.    Ken Shirley worked for LJS for approximately 23 years, working his way up from cook to Area Coach/Area District Manager in charge of fourteen stores between Modesto and Bakersfield. Just prior to his termination, Plaintiff Ken Shirley was on approved leave while recovering from knee surgery due to a non-work related injury.  While off work, Plaintiff Ken Shirley's supervisor, Region Coach, Darren McGilbray, and the managers of two stores within Plaintiff Ken Shirley's district, shared his duties and responsibilities.

2.    Amparo Lara worked for LJS for almost 10 years, working her way up from cook to Store Manager.  Plaintiff Ken Shirley promoted her to manager of the Porterville store in 2004.  In late April 2006, Plaintiff Amparo Lara became ill and needed some time off from work to recover.  During Plaintiff Amparo Lara's absence, Ken Shirley placed Team Leader, Noemi Ledesma, in charge of the Porterville store because of her previous performance as Acting Manager.

3.    Both Plaintiff Ken Shirley and Plaintiff Amparo Lara were superior performers; rising through the ranks and turning around their stores.

4.    Prior to Plaintiff Amparo Lara's illness, she and Plaintiff Ken Shirley had identified difficulties with the way the bank processed the Porterville store's deposits.  Plaintiff Amparo Lara and Plaintiff Ken Shirley had requested, but had not yet been granted permission to change banks because of these

1    difficulties.

2        5.    While both Plaintiff Ken Shirley and Plaintiff Amparo
3    Lara were off work, the acting manager of the Porterville store
4    (#5245), Noemi Ledesma, began embezzling money.  Although both of
5    the people covering for Plaintiff Ken Shirley received multiple
6    e-mails from the Cash Handling Department indicating that
7    deposits may not have been made by the Porterville store, neither
8    of them acted upon this information.  After receiving the e-mails
9    from the Cash Handling Department for several days, and while
10   still off work, Plaintiff Ken Shirley, who had also been
11   receiving the e-mails at home, began forwarding the e-mails to
12   the Porterville store.  Each time, Plaintiff Ken Shirley received
13   credible assurance that the difficulty was the same problem
14   identified by Plaintiff Ken Shirley and Plaintiff Amparo Lara
15   before they took their leaves.  While still off work, Plaintiff
16   Ken Shirley even directed one of the people covering for him to
17   go to the Porterville store.  That person did not discover any
18   embezzlement or other wrongdoing.

19       6.    On his first day back to work, Plaintiff Ken Shirley
20   went to the Porterville store himself, and discovered that the
21   daily deposit log had not been completed for the previous two
22   weeks.  Plaintiff Ken Shirley reviewed the proper procedure for
23   completion of the deposit log with Ms. Ledesma and instructed her
24   to have the log updated by the time Plaintiff Amparo Lara was to
25   returned to work eight days later.

26       7.    On Plaintiff Amparo Lara's first day back to work, Ms.
27   Ledesma still had not updated the deposit log.  Therefore,
28   Plaintiff Ken Shirley and Plaintiff Amparo Lara reconstructed the

                                  3

1  Bank Deposit Log and were able to account for all deposits except

2  for seven missing deposits totaling $9,792.99.  They quickly

3  determined that Ms. Ledesma had stolen the missing money.

4  Immediately after Ms. Ledesma was terminated, LJS turned on

5  Plaintiffs over things that took place while they were off work

6  on approved leave and others were supposed to be covering their

7  responsibilities.

8          **Facts for Plaintiff Ken Shirley**

9          8.    Ken Shirley worked for LJS for approximately 23 years,

10 working his way up from cook to Area Coach/Area District Manager

11 in charge of fourteen stores between Modesto and Bakersfield.

12 Just prior to his termination, Plaintiff Ken Shirley was on

13 approved leave while recovering from knee surgery due to a non-

14 work related injury.  While off work, Plaintiff Ken Shirley's

15 supervisor, Region Coach, Darren McGilbray, and the managers of

16 two stores within Plaintiff Ken Shirley's district shared his

17 duties and responsibilities.

18         9.    Plaintiff Ken Shirley was originally hired by LJS in

19 about March 1983 as a cook for the Clovis and Kings Canyon

20 Avenues restaurant in Fresno, California.  Because of his

21 superior work performance, he advanced through the ranks, and in

22 about May 1995, LJS promoted him to Area Coach/Area District

23 Manager in charge of fourteen stores between Modesto and

24 Bakersfield.  Altogether, Plaintiff Ken Shirley worked for LJS

25 for approximately 23 years and 5 months until LJS unlawfully

26 terminated him.  At all relevant times, Plaintiff Ken Shirley's

27 home base restaurant was in the County of Fresno, California.

28 LJS terminated Plaintiff Ken Shirley in the County of Fresno and

                              **4**

1  approximately one quarter of the restaurants he was responsible
2  for were in the County of Fresno.

3      10.  On or about November 26, 2005, Plaintiff Ken Shirley
4  was involved in a non-work related motorcycle accident in which
5  he injured one of his anterior cruciate ligaments (ACL).
6  Approximately one week after the accident, Plaintiff Ken
7  Shirley's doctor told him that he needed surgery, but that he
8  could postpone surgery until it was convenient for work.

9      11.  One of the LJS' business innovations is multi-brand
10  stores including various combinations of Taco Bell, LJS, A&W,
11  Pizza Hut, and Kentucky Fried Chicken.  The concept encourages
12  family or group dining because it offers a greater variety of
13  food than a single restaurant.  Although LJS staked its future on
14  this concept, Plaintiffs are informed and believe that many of
15  LJS' multi-brand stores were losing money.

16      12.  None of the management staff at any of the multi-brand
17  stores for which Plaintiff Ken Shirley was responsible had any
18  experience in opening a new store, and there was no store where
19  the staff could be trained because the nearest multi-brand LJS
20  and A&W store was in Bakersfield.  At about the time of Plaintiff
21  Ken Shirley's accident, LJS was planning to open its first multi-
22  brand store (LJS and A&W) in the Fresno area at Peach and Shaw
23  Avenues in Clovis, California.  It was very important to LJS that
24  Plaintiff Ken Shirley be present for the preparation of and the
25  opening of this store.  Therefore, for the convenience of his
26  employer, Plaintiff Ken Shirley agreed to postpone his surgery
27  until after the new store opened.

28      13.  On or about January 15, 2006, Store #5245 in

1  Porterville began having difficulties with the bank it was using

2  for cash deposits.  These difficulties revolved around the

3  specific way this bank processed deposits.  After investigating,

4  Plaintiff Ken Shirley determined that the most expedient solution

5  was to have this store change banks to another bank that would

6  process the deposits in a way that was compatible with LJS cash

7  management procedures.

8      14.  On or about March 22, 2006, Plaintiff Ken Shirley

9  requested approval to allow the Porterville store (#5245) to

10  change banks.  As of May 12, 2006, when Plaintiff Ken Shirley

11  took medical leave for his surgery, LJS still had not authorized

12  the change of banks for the Porterville store (#5245).

13      15.  On or about May 3, 2006, shortly after one of the most

14  successful openings in LJS history at the Clovis LJS-A&W store,

15  Plaintiff Ken Shirley's Region Coach, Darren McGilbray, granted

16  Plaintiff Ken Shirley permission to use vacation time for his ACL

17  surgery.  They agreed that Plaintiff Ken Shirley would be off

18  work from the day of surgery, May 12, 2006, through June 4, 2006,

19  and he would return to work on Monday, June 5, 2006.

20      16.  They also agreed that while Plaintiff Ken Shirley was

21  off work, Mike Olson, General Manager of the Bakersfield Rosedale

22  Highway store, and Robert Alcala, the General Manager of the

23  Fresno Cedar and Ventura store would assume Plaintiff Ken

24  Shirley's oversight responsibilities, and Mr. McGilbray would

25  oversee Mr. Olson and Mr. Alcala.

26      17.  LJS cash handling policies provided that all Cash

27  Discrepancy Notices for each store in the region (including

28  Porterville Store #5245) were simultaneously e-mailed by the bank

**6**

each day to three people: (1) Plaintiff Ken Shirley, the Area Coach responsible for the store in question; (2) Mr. McGilbray, the Region Coach responsible for the store in question; and (3) Kevin Rice, LJS Loss Prevention Manager.

18.   Plaintiff Ken Shirley's surgery took place as scheduled on May 12, 2006.  Since Plaintiff Ken Shirley was on approved medical leave, he was not supposed to have any work responsibilities, and he was confident that Mr. McGilbray, Mr. Rice, Mr. Olson, and Mr. Alcala could handle his job duties while he was on leave.

19.   Plaintiff Ken Shirley did not have any contact with work for about one week after surgery.  Even though Plaintiff Ken Shirley did not believe that he was required to check in or monitor his e-mail since other LJS management were also receiving them, he nonetheless looked at his e-mails on about May 22, 2006, out of a sense of duty to his employer.

20.   Approximately one week after Plaintiff Ken Shirley resumed monitoring his e-mail (beginning approximately May 29, 2006), he noticed that the cash department was sending Cash Discrepancy Notices regarding Store #5245 in Porterville. Plaintiff Ken Shirley knew that Mr. McGilbray and Loss Prevention Manager Kevin Rice were also receiving the Cash Discrepancy Notices for Store #5245.

21.   At that time, the Restaurant General Manager, Amparo Lara, was also off work on disability leave.  She did not have access to any company e-mails while she was off.  This store had a history of receiving Cash Discrepancy Notices due to the way the particular bank that store used, was validating the store's

7

deposits.   Therefore, Plaintiff Ken Shirley initially assumed
that these Cash Discrepancy Notices were a continuation of the
same difficulty with the bank, and not a cause for concern that
some employee might be embezzling cash.   Plaintiff Ken Shirley
also believed that Mr. McGilbray and/or Mr. Rice would take care
of any discrepancy, and correct any problems regarding Store
#5245 and/or the bank, since they both were receiving the same e-
mails and they both knew that Plaintiff Ken Shirley was out on
medical leave.

22.   After receiving Cash Discrepancy Notices for this same
store for approximately three days in a row, Plaintiff Ken
Shirley began forwarding the cash discrepancy notice e-mails to
that store.   Each time he forwarded one of these cash discrepancy
notice e-mails to Store #5245, the acting manager of that store
responded by advising him that there were no discrepancies, and
that the cash deposits were being made on time and in the proper
manner.

23.   Because of the number of Cash Discrepancy Notices
Plaintiff Ken Shirley had received regarding Store #5245 and that
Plaintiff Amparo Lara was off work at the same time, Plaintiff
Ken Shirley telephoned that store on about May 30, 2006, and
again on about June 2, 2006.   On each occasion, he was reassured
by the acting manager, Noemi Ledesma, that all was well with the
banking deposits and that the Cash Discrepancy Notices were due
to the manner in which the bank, that that particular store used,
validated cash deposits.

24.   Although Plaintiff Ken Shirley had no solid reason to
doubt Ms. Ledesma's response, out of an abundance of caution, on

1  about May 30, 2006, he telephoned Mike Olson, the Rosedale
2  Highway restaurant General Manager, (one of the two individuals
3  covering his responsibilities while he was gone) and asked Mr.
4  Olson to perform a site visit to see if he could determine what,
5  if anything, was wrong at Store #5245.  Plaintiff Ken Shirley
6  believes that Mr. Olson performed the requested visit while
7  Plaintiff Ken Shirley was on leave but that Mr. Olson did not
8  ascertain anything wrong with the cash bank deposits at that
9  store.

10      25.  Because of the continuing Cash Discrepancy Notices,
11 Plaintiff Ken Shirley had received regarding Store #5245, and
12 that Plaintiff Amparo Lara was still off work, on Plaintiff Ken
13 Shirley's first day back to work, on or about June 5, 2006, he
14 personally went to Store #5245 in Porterville.  During his visit,
15 all three lead personnel then running the store assured him that
16 the deposits were made correctly on time, and that there were no
17 known discrepancies with the bank deposits.

18      26.  However, because the deposit log had not been properly
19 filled out for the previous two weeks or so, it was impossible
20 for him to verify the accuracy of the bank cash deposits.
21 Plaintiff Ken Shirley reviewed the proper procedure for
22 completion of the Deposit Log with Ms. Ledesma and instructed her
23 to have the Deposit Log up to date by the time the Restaurant
24 General Manager, Amparo Lara, returned to work on June 13, 2006,
25 eight days later.  Plaintiff Ken Shirley further notified Ms.
26 Ledesma that she, Plaintiff Ken Shirley, and Plaintiff Amparo
27 Lara, would review the updated deposit log on Plaintiff Amparo
28 Lara's first day back to work, June 13, 2006.

1    27.   On or about June 12, 2006, one day prior to Plaintiff
2  Ken Shirley's scheduled meeting with Ms. Amparo and Ms. Ledesma
3  of Store #5245, Plaintiff Ken Shirley received a telephone call
4  from Region Coach/Regional V.P. Darren McGilbray regarding the
5  Cash Discrepancy Notices at Store #5245.  Plaintiff Ken Shirley
6  notified Mr. McGilbray of his earlier efforts to resolve this
7  situation and of his meeting scheduled for the following day with
8  Acting Manager Ledesma and returning restaurant General Manager
9  Lara.  Mr. McGilbray expressed satisfaction with Plaintiff Ken
10 Shirley's efforts to resolve this situation.

11    28.   Also on June 12, 2006, Plaintiff Ken Shirley spoke with
12 Human Resources Manager, Ipo Hoops, regarding the missing
13 deposits from Store #5245.  Mrs. Hoops indicated that she had
14 heard of the missing deposits from McGilbray and was glad
15 Plaintiff Ken Shirley had called her before she called him.
16 Plaintiff Ken Shirley told her he did not think there was an
17 issue, and would notify her of the results of the visit he had
18 scheduled the following day.  She was confident in Plaintiff Ken
19 Shirley's abilities and said to let her know if he needed
20 anything from her.  Mrs. Hoops and Plaintiff Ken Shirley stayed
21 in contact, weekly at minimum, from this day forward, but she
22 never visited the restaurant herself.  Prior to this incident,
23 they had only communicated on a monthly basis.  Later that day,
24 Plaintiff Ken Shirley spoke with Loss Prevention Manager, Kevin
25 Rice, about the Cash Discrepancy Notices regarding Store #5245.
26 He too seemed confident in Plaintiff Ken Shirley's approach to
27 the situation.

28    29.   The next day, on or about June 13, 2006, Plaintiff Ken

1  Shirley returned to Store #5245 and discovered that Acting

2  Manager Ledesma had not updated the bank deposit logs as

3  instructed.   Therefore, Restaurant General Manager Lara and

4  Plaintiff Ken Shirley reconstructed the Bank Deposit Log and were

5  able to account for all deposits except for seven missing

6  deposits totaling $9,792.99.   Throughout the previous day,

7  Plaintiff Ken Shirley had also been in discussion with Loss

8  Prevention Manager, Kevin Rice, regarding this situation.   On the

9  same day, while Plaintiff Amparo Lara and Plaintiff Ken Shirley

10  were reconstructing the Bank Deposit Log, Mr. Rice visited Store

11  #5245.   Plaintiff Ken Shirley showed Mr. Rice what Plaintiff

12  Amparo Lara and Plaintiff Ken Shirley were doing to resolve the

13  situation.   Mr. Rice was comfortable with their efforts.

14       30.   The following day, June 14, 2006, Plaintiff Amparo Lara

15  and Plaintiff Ken Shirley went to the bank to investigate whether

16  they had any record of receiving deposits on the seven days in

17  question.   The bank did not.   Therefore, Plaintiff Amparo Lara

18  and Plaintiff Ken Shirley began interviewing the three Team

19  Leaders who were responsible for running that store in Plaintiff

20  Amparo Lara's absence.   It quickly became apparent that Ms.

21  Ledesma had assumed full responsibility for all bank deposits

22  during Plaintiff Amparo Lara's absence.   Ms. Ledesma had

23  instructed the other two Team Leaders not to worry about the bank

24  deposits, saying she would take care of them, or words to that

25  effect.

26       31.   Further, Plaintiff Ken Shirley also telephoned the

27  corporate cash department on several occasions in an effort to

28  ensure that these deposits inadvertently had not been posted to a

1 | different restaurant or account.  Ultimately, the corporate cash
2 | department, Plaintiff Amparo Lara and Plaintiff Ken Shirley were
3 | unable to account for any of the seven missing deposits totaling
4 | $9,792.99, and it became increasingly likely that Acting Manager
5 | Ledesma had embezzled these funds.

6 | 32.  On or about June 15, 2006, Plaintiff Ken Shirley
7 | contacted Loss Prevention Manager, Kevin Rice, and his
8 | supervisor, Mr. McGilbray and informed them of his suspicion that
9 | Acting Manager Ledesma had taken the missing deposits.

10 | 33.  Since the first day Plaintiff Ken Shirley spoke with
11 | Mr. McGilbray about this issue (June 12, 2006) Plaintiff Ken
12 | Shirley was also communicating with the Regional Human Resources
13 | Manager, Mrs. Ipo Hoops, about this issue.  In confidence and
14 | specifically "off the record," Mrs. Hoops repeatedly stated that
15 | this issue was not over and that Plaintiff Ken Shirley should not
16 | be at all comfortable because his job was in jeopardy because of
17 | the missing deposits no matter what Mr. McGilbray told Plaintiff
18 | Ken Shirley.  Because Mrs. Hoops repeated this warning, Plaintiff
19 | Ken Shirley addressed the matter several times with Mr. McGilbray
20 | over the remainder of his employment with Yum Brands/Long John
21 | Silver's.

22 | 34.  On June 19, 2006, Plaintiff Ken Shirley's supervisor,
23 | Mr. McGilbray, was in the Sacramento, California, office for
24 | meetings unrelated to the missing deposits.  On that same day,
25 | Plaintiff Ken Shirley was also in the Sacramento, California,
26 | office for a meeting unrelated to the missing deposits.
27 | Plaintiff Ken Shirley approached Mr. McGilbray between meetings.
28 | He did not raise the missing deposits from Store #5245.  When

1   Plaintiff Ken Shirley raised the issue of the missing deposits,

2   Mr. McGilbray assured Plaintiff Ken Shirley that based on

3   Plaintiff Ken Shirley's actions and thorough follow-through on

4   this matter, that Plaintiff Ken Shirley was fine and not in

5   jeopardy of termination over this issue.  Mr. McGilbray returned

6   to Kansas with no further investigation or discussion of this

7   issue.

8      35.  As a regular part of Plaintiff Ken Shirley's weekly

9   routine, he had one-on-one telephone conversations with Mr.

10   McGilbray on Tuesdays.  During these weekly conversations, Mr.

11   McGilbray never brought up the issue of the missing deposits from

12   Store #5245.  Therefore, Plaintiff Ken Shirley regularly brought

13   up the issue of the missing deposits, as the warnings from Mrs.

14   Hoops continued.  Mr. McGilbray assured Plaintiff Ken Shirley

15   that this issue was not a threat to Plaintiff Ken Shirley's job

16   security.

17      36.  On or about June 26, 2007, Loss Prevention Manager,

18   Kevin Rice, called a meeting to meet in Porterville to terminate

19   Noemi Ledesma for failure to secure company funds.  On June 27,

20   2007, with the approval of Human Resources Manager, Ipo Hoops,

21   Mr. Rice and Plaintiff Ken Shirley terminated Ms. Ledesma.  After

22   terminating Ms. Ledesma, Mr. Rice turned his interrogation toward

23   Plaintiff Ken Shirley and his business practices.  It was

24   apparent he was not going to take the matter to the police as

25   they had previously discussed.  He asked Plaintiff Ken Shirley

26   questions regarding how Plaintiff Ken Shirley trained his team on

27   cash procedures, how he followed up on their training, and what

28   they could do as a region to ensure this would not recur, as

13

1  Plaintiff Ken Shirley was the second of three Area Coaches that
2  had multiple deposits disappear while Mr. McGilbray was their
3  Region Coach.  Plaintiff Ken Shirley was concerned about cash
4  handling from the initial training of all members of management
5  and the commitment to daily follow-up.

6       37.  On or about July 13, 2006, Plaintiff Ken Shirley drove
7  to Las Vegas, Nevada, for his mid-year review with Mr. McGilbray.
8  Since Plaintiff Ken Shirley had been receiving conflicting
9  messages from his immediate supervisor and human resources for
10 several months, Plaintiff Ken Shirley looked forward to the
11 opportunity to discuss his performance and to obtain a written
12 performance evaluation.

13      38.  LJS uses a Balanced Score Card (BSC) to grade the
14 performance of all operations staff from Assistant Restaurant
15 Managers to the President of LJS.  Plaintiff Ken Shirley received
16 a rating of 3.3 out of 5.0, which is "On Target."  Mr.
17 McGilbray's Region BSC rating was 2.1 or "Below Target."  LJS's
18 BSC rating was 2.5.  Significantly, Mr. McGilbray awarded
19 Plaintiff Ken Shirley 4.15 out of 5.0 for leadership and he
20 indicated that Plaintiff Ken Shirley had no significant areas in
21 need of improvement.  As the conversation around Plaintiff Ken
22 Shirley's evaluation began to wrap-up he changed gears and began
23 to speak of his up coming two week vacation to Switzerland.  Mr.
24 McGilbray was planning to leave Monday, July 17, 2006, and return
25 on Monday, July 31, 2006.

26      39.  Plaintiff Ken Shirley was one of ten Area Coaches who
27 reported directly to Mr. McGilbray.  Because of Plaintiff Ken
28 Shirley's superior performance, LJS selected Plaintiff Ken

**14**

1    Shirley to run the region while Mr. McGilbray was out of the
2    country in July 2006.  Plaintiff Ken Shirley believes Mr.
3    McGilbray selected him to run the region in his absence, and that
4    he did so with the approval of at least one level of management
5    above him.  Between the time LJS selected Plaintiff Ken Shirley
6    to fill in for Mr. McGilbray and the time of Mr. McGilbray's
7    departure, Plaintiff Ken Shirley spoke with LJS President, Andy
8    Rosen, who confirmed that he was aware of the fact that Plaintiff
9    Ken Shirley was filling-in for Mr. McGilbray during McGilbray's
10   vacation.

11        40.  Plaintiff Ken Shirley's additional responsibilities
12   included, but were not limited to: running the region conference
13   calls for Mr. McGilbray's nine other Area Coaches and 66
14   restaurants; leading the weekly multi-brand conference calls (a
15   duty that Mr. McGilbray and Plaintiff Ken Shirley had shared for
16   some months); presenting the region profit and loss statement for
17   period 7 to LJS Head Coach (Vice President) and seven other
18   Region Coaches; and handle whatever daily issues that arose.

19        41.  After a lengthy conversation about Mr. McGilbray's
20   vacation plans, Plaintiff Ken Shirley turned the conversation
21   back toward the issue of the missing deposits from Store #5245 as
22   it had yet to be resolved.  Mr. McGilbray telephoned Loss
23   Prevention Manager, Kevin Rice, and put him on speakerphone to
24   discuss the matter.  In this telephone conversation, Plaintiff
25   Ken Shirley learned that nothing had been done or even discussed
26   since the day of Ms. Ledesma's termination June 26, 2006.

27        42.  Significantly, Mr. Rice had not given any of the
28   evidence to the Porterville Police Department as he indicated he

1    would prior to Ms. Ledesma's termination.  Further, Mr. Rice told

2    Mr. McGilbray that Store #5245 was following the security

3    procedures to the letter, and had no further issues with late

4    deposits.   Immediately after hanging up the phone, Mr. McGilbray

5    stood and paced about the room saying that he would have liked

6    Plaintiff Ken Shirley to have done things differently, but never

7    stated what he would have had Plaintiff Ken Shirley do.  He again

8    assured Plaintiff Ken Shirley that his future with LJS was

9    "fine."

10        43.   On Saturday, July 29, 2006, Mr. McGilbray phoned

11   Plaintiff Ken Shirley about 2:00 p.m., asking about the state of

12   the region during his vacation.   Plaintiff Ken Shirley told him

13   that one store in Plaintiff Ken Shirley's area had burned due to

14   fryer crumbs left overnight in a garbage can inside the

15   restaurant (exactly in accordance with company security policy)

16   and another store, not in Plaintiff Ken Shirley's area, had to be

17   permanently closed due to neglect of the air conditioners and

18   coolers.

19        44.   Seemingly uninterested by these two major items, and

20   after months of being disinterested in the stolen deposits from

21   Store #5245, Mr. McGilbray quickly turned the conversation to the

22   stolen deposits.  Mr. McGilbray informed Plaintiff Ken Shirley

23   that he would fly to California on Monday, July 31, 2006, or

24   Tuesday, August 1, 2006, to meet with terminated Team Leader

25   Ledesma.  Plaintiff Ken Shirley asked Mr. McGilbray if he wanted

26   him to arrange a meeting since Ms. Ledesma had been terminated

27   and it would be difficult to arrange a meeting with a previously

28   terminated employee at the last minute.  Mr. McGilbray stated

**16**

1 || that that would not be necessary.

2 ||     45.   On Sunday, July 30, 2006, Plaintiff Ken Shirley

3 || received an e-mail from Mr. McGilbray stating that he would fly

4 || into Fresno on Monday, July 31, 2006, in the afternoon but was

5 || not specific as to his arrival time.

6 ||     46.   On Monday, July 31, 2006, at approximately 4:00 p.m.,

7 || Plaintiff Ken Shirley received a telephone call from Mr.

8 || McGilbray saying he wanted to meet at the burned restaurant at

9 || the corner of Blackstone and Herndon, in Fresno, California.

10 || Plaintiff Ken Shirley informed Mr. McGilbray that Plaintiff Ken

11 || Shirley would meet him there in 20 minutes.  Plaintiff Ken

12 || Shirley arrived to find Mr. McGilbray and Human Resource Manager,

13 || Mrs. Hoops.  Plaintiff Ken Shirley asked Mrs. Hoops why she was

14 || there and her eyes began to water as she turned away from

15 || Plaintiff Ken Shirley.

16 ||     47.   After some small talk, Mr. McGilbray handed Plaintiff

17 || Ken Shirley a document stating that Plaintiff Ken Shirley was

18 || being placed on administrative leave pending completion of Mr.

19 || McGilbray's and Mrs. Hoops' investigation into the stolen

20 || deposits at Store #5245 in Porterville, California.  Plaintiff

21 || Ken Shirley believes that Mr. McGilbray and Mrs. Hoops proceeded

22 || directly to Store #5245 in Porterville where they placed

23 || Plaintiff Amparo Lara (the store manager who had been on medical

24 || leave at the time of the embezzlement) on administrative leave

25 || pending completion of the same investigation.

26 ||     48.   The next day, Tuesday, August 1, 2006, Mr. McGilbray

27 || and Mrs. Hoops terminated Plaintiff Ken Shirley's employment.

28 || Their stated reason for Plaintiff Ken Shirley's termination was

"it was discovered that there were several Cash and Security

violations that occurred and that Plaintiff Ken Shirley was

negligent in failing to stop or correct these discrepancies in an

effective manner.  These violations include proper, prompt and

effective response to Cash Discrepancy Notices and failure to

correct Cash handling practices in management at 5245."

49.  Also, on August 1, 2006, Mr. McGilbray and Mrs. Hoops

terminated Plaintiff Amparo Lara.  The stated reason for

Plaintiff Amparo Lara's termination was as follows:

> Shirley, your Area Coach.  During this investigation,
> you and he assumed that the late deposit trend was
> because of a banking issue.  On and around June 12,
> 2006, Kevin Rice, your Loss Prevention Manager,
> conducted and [sic] investigation in regards to missing
> deposits in the amount of $9,792.99 that occurred at
> your restaurant from May 16-May 25.  It was revealed in
> this investigation that there were several Cash Policy
> violations in [sic] which you did not prevent from
> happening.  Documents like the deposit log were not
> kept up per standard and deposits were not consistently
> being taken to the bank every day before open [sic].
> It was determined that this was the cause of frequent
> late postings of the funds and the frequent CDNs.  You
> failed to enforce Long John Silver's Cash Handling
> policy in your restaurant.  This ultimately resulted in
> the amount of $9,792.99 to be unaccounted for."

50.  Plaintiff Ken Shirley is informed, believes, and

alleges that because less than 24 hours passed between the time

Plaintiff Amparo Lara and Plaintiff Ken Shirley were placed on

administrative leave pending an investigation into the cash

losses; placing him on administrative leave was a pretext and

that the real reason(s) for placing him on administration leave

and for terminating him were that:

a.   LJS perceived and/or regarded Plaintiff Ken

Shirley to be at least temporarily disabled;

b.   Cash handling discrepancies arose at Store #5245

18

1  during Plaintiff Ken Shirley's temporary disability leave, and
2  Mr. McGilbray and/or Mr. Rice failed and refused to perform
3  Plaintiff Ken Shirley's cash oversight duties during Plaintiff
4  Ken Shirley's temporary disability leave, as LJS was required and
5  agreed to do;

6          c.   Because of McGilbray's and/or Mr. Rice's failure
7  and refusal to perform the cash oversight functions normally
8  assigned to Plaintiff Ken Shirley (but which were temporarily
9  assigned to them during Plaintiff Ken Shirley's disability leave)
10 that LJS suffered a much greater financial loss than it would
11 have been if Mr. McGilbray and/or Mr. Rice had performed the
12 duties temporarily assigned to them in a diligent, competent, and
13 professional manner;

14         d.   Retaliation for Plaintiff Ken Shirley's
15 complaining about being held responsible for activities that took
16 place while he was on temporary disability leave; and to cover
17 Mr. McGilbray's negligent failures and refusals to act when given
18 multiple notices that the cash handling problem at Store #5245
19 existed during the period of time when it was Mr. McGilbray's
20 direct responsibility (and not Plaintiff Ken Shirley's) to
21 investigate the cash handling discrepancies at Store #5245 in
22 Porterville, California; and

23         e.   Because Plaintiff Ken Shirley is over 40 years old
24 and LJS wanted to replace him with a younger less experienced
25 person that it could pay less.

26     51.  Following Plaintiff Ken Shirley's termination, the
27 parent company, Yum Brands, sold its LJS division to one of its
28 franchisees, Apex Management Company.  In recognition of

19

1  Plaintiff Ken Shirley's long-time superior performance and
2  knowledge of the business and this specific territory, the owner,
3  Tabbassum Mumtaz, sought out Plaintiff Ken Shirley and hired him
4  as its Director of Operations for the 23 California restaurants
5  Apex/Mr. Mumtaz had just purchased.

6       52.  In effect, Plaintiff Ken Shirley now has his former
7  boss's job.  Since Apex Management Company hired Plaintiff Ken
8  Shirley, he has continued to perform at his usual excellent
9  level.

10      **Facts for Plaintiff Amparo Lara**

11      53.  Amparo Lara is a Hispanic female.  LJS hired her on or
12 about December 5, 1996, as a cook for the LJS restaurant located
13 at 3200 South Mooney Boulevard, in Visalia, California.  Because
14 of her superior work performance, she advanced through the ranks
15 until, on about December 9, 2004, her Area Coach, Plaintiff Ken
16 Shirley, promoted her to the position of Store Manager, assigning
17 her to the store located at 596 West Olive Avenue in Porterville,
18 California, where she worked until she was unlawfully terminated.

19      54.  Plaintiff Amparo Lara performed her duties in a
20 diligent, competent and professional manner and always acted in
21 the best interest of her employer.  In Plaintiff Amparo Lara's
22 first year as Manager of Store 5245, she turned the store around.
23 The year before Plaintiff Amparo Lara took over Store 5245 lost
24 approximately $18,000.

25      55.  In Plaintiff Amparo Lara's first year, Store 5245 made
26 a small profit.  Further, Plaintiff Amparo Lara received at least
27 two written performance evaluations during her tenure as manager
28 of Store #5245.  Plaintiff Amparo Lara believes that she was

1  rated as being "On Target" on both her written performance
2  evaluations.

3      56.   Plaintiff Amparo Lara believes that many of the
4  managerial decisions regarding her employment, specifically
5  including but not limited to: her promotion to store manager,
6  direct supervisory oversight of the operation of the Porterville
7  store; supervisory oversight regarding the bank deposits at
8  issue, and possibly the decision to terminate her employment took
9  place in the City and County of Fresno, California.

10     57.   On about January 15, 2006, store #5245 in Porterville
11 began having difficulties with the bank it was using for cash
12 deposits.  After investigating, Plaintiff Amparo Lara and her
13 Supervisor, Ken Shirley, determined that this store should change
14 banks to one that would process the deposits in a way that was
15 compatible with LJS cash handling procedures.

16     58.   On or about March 22, 2006, Plaintiff Amparo Lara and
17 her immediate supervisor, Ken Shirley, requested approval from
18 the corporate office to allow store #5245 to change banks.  LJS
19 corporate had not yet approved the change of banks for store
20 #5245 by the time that Plaintiff Amparo Lara became ill in late
21 April 2006.

22     59.   During the week of April 20, 2006, Plaintiff Amparo
23 Lara began feeling ill and had difficulty speaking.  Plaintiff
24 Amparo Lara's doctor ordered her to take a week off from work to
25 rest and recover from her illness.

26     60.   Plaintiff Amparo Lara's physician scheduled a follow-up
27 appointment for May 5, 2006, and told Plaintiff Amparo Lara that
28 if she were not better by her May 5, 2006 appointment, that she

1  would have to take additional time off to recover from her

2  illness.  Plaintiff Amparo Lara immediately notified her

3  supervisor, Ken Shirley, and arranged to cover her

4  responsibilities at Store #5245 and to use her accrued vacation

5  time for the week off work.

6       61.  Plaintiff Amparo Lara returned to work after her

7  initial time off due to illness and everything was fine.  Ms.

8  Noemi Ledesma had handled the daily cash deposits properly, and

9  no major issues had arisen during Plaintiff Amparo Lara's

10  absence.

11      62.  In light of the above warning by Plaintiff Amparo

12  Lara's doctor, it became apparent that Plaintiff Amparo Lara's

13  doctor might require her to take additional time off work

14  starting at about the time of her follow-up appointment scheduled

15  for May 5, 2006.  Plaintiff Amparo Lara notified her supervisor,

16  Plaintiff Ken Shirley of this likelihood.  Therefore, on or about

17  May 1, 2006, Plaintiff Ken Shirley, called a meeting to prepare

18  the Team Leaders of Store #5245 for Plaintiff Amparo Lara's

19  anticipated time off due to her illness.

20      63.  Ms. Ledesma had worked at Store #5245 prior to

21  Plaintiff Amparo Lara's arrival.  During that time, Ms. Ledesma

22  had covered for her previous manager.  Plaintiff Amparo Lara

23  believes that during that time, Ms. Ledesma had done a good job

24  of covering for her then-manager.  Because Ms. Ledesma was

25  attending school in the evenings, she had been regularly

26  scheduled to work mornings.  Ms. Ledesma regularly handled the

27  bank deposits, which were made each morning.  Therefore, Ms.

28  Ledesma had significant experience with preparing the bank

1  deposits and the associated paperwork and Ms. Ledesma had shown
2  herself to be competent and trustworthy with the cash handling
3  procedures.

4       64.  During her time off work during her illness, Plaintiff
5  Amparo Lara took it upon herself to communicate with Ms. Ledesma
6  in an attempt to ensure that Store #5245 was managed properly in
7  Plaintiff Amparo Lara's absence.  Every time Plaintiff Amparo
8  Lara spoke with Ms. Ledesma, Ms. Ledesma had questions but
9  reasonably appeared to have things under control in Plaintiff
10 Amparo Lara's absence.

11      65.  After Plaintiff Ken Shirley injured his knee while off
12 duty, which required surgery that had previously been scheduled
13 for the same time as Plaintiff Amparo Lara's second illness-
14 related time off (May 5-June 13, 2006).

15      66.  Plaintiff Amparo Lara believes that Plaintiff Ken
16 Shirley had assigned his oversight responsibilities to Mike
17 Olson, General Manager of the Rosedale Highway store in
18 Bakersfield and Robert Alcala, the General Manager of the store
19 at Cedar and Ventura in Fresno.  Both were very experienced
20 managers, more than capable of handling any question or
21 difficulty that Ms. Ledesma might have encountered during
22 Plaintiff Amparo Lara's approximately five weeks off work.

23      67.  Further, Plaintiff Ken Shirley's supervisor, Darren
24 McGilbray, was aware of and had approved all of the above
25 arrangements and decisions regarding Plaintiff Amparo Lara's
26 second absence due to illness and Mr. McGilbray was aware of and
27 had approved all of the above arrangements and decisions
28 regarding Plaintiff Ken Shirley's medically related absence.

1    68.   Beginning on about May 16, 2006, eleven days after

2  Plaintiff Amparo Lara and her Immediate Supervisor, Ken Shirley

3  were both off work, bank deposits at Store #5245 started missing.

4    69.   The first missing bank deposit was from May 16, 2006.

5  Plaintiff Amparo Lara believes that Company policy required the

6  Cash Handling Department to send an e-mail to the Loss Prevention

7  Department, the Area Coach, and the Region Coach of any store

8  with a bank deposit that could not be verified within the time

9  allotted by Company policy.  Plaintiff Amparo Lara is informed,

10  believes, and alleges that the Cash Handling Department began

11  sending e-mails regarding the missing deposits for Store #5245 on

12  or about May 17, 2006.

13    70.   Plaintiff Amparo Lara is informed, believes, and

14  alleges that Plaintiff Ken Shirley began forwarding the e-mails

15  from the Cash Handling Department to Ms. Ledesma on approximately

16  May 31, 2006.  Plaintiff Amparo Lara is informed, believes, and

17  alleges that, on or about May 31, Plaintiff Ken Shirley began

18  telephoning Ms. Ledesma and inquiring about the missing bank

19  deposits.  Apparently, Ken Shirley was initially satisfied with

20  Ms. Ledesma's initial explanation regarding the missing bank

21  deposits.

22    71.   On or about June 12, 2006, in one of their twice-daily

23  telephone calls, Ms. Ledesma first told Plaintiff Amparo Lara

24  that bank deposits were missing and that Ms. Ledesma had been

25  receiving e-mails forwarded from Plaintiff Ken Shirley from the

26  Cash Handling Department to that effect.

27    72.   At that time, Ms. Ledesma was aware of approximately

28  seven missing bank deposits.  However, this was the first time

**24**

1  that Plaintiff Amparo Lara became aware of the missing bank

2  deposits, as Plaintiff Amparo Lara did not receive any e-mails

3  while she was off because she did not have a computer at home.

4      73.  When Plaintiff Amparo Lara became aware of the missing

5  bank deposits, she immediately insisted upon returning to work

6  the next day despite her doctor's refusal to release her.  Left

7  with no choice, Plaintiff Ken Shirley agreed to meet with

8  Plaintiff Amparo Lara at Store #5245 on June 13, 2006.

9      74.  On her first day back to work, on or about June 13,

10  2006, Plaintiff Amparo Lara met with Plaintiff Ken Shirley at

11  Store #5245 in an effort to resolve the mystery of the missing

12  bank deposits.  After being initially unable to locate the

13  missing deposits, Plaintiff Amparo Lara telephoned Ms. Ledesma

14  and requested that Ms. Ledesma meet Plaintiffs at Store #5245.

15      75.  When Ms. Ledesma arrived at Store #5245, it was

16  apparent that Ms. Ledesma had not been: (1) properly filling out

17  the Daily Deposit Log; (2) properly filling out the Daily Red

18  Book; (3) storing the original bank deposit slips in the proper

19  location within Store #5245; and (4) sending copies of the bank

20  deposit slips to the corporate Cash Handling Department.

21      76.  On or about June 14, 2006, Plaintiff Amparo Lara and

22  Plaintiff Ken Shirley went to the bank to investigate whether

23  they had any record of receiving deposits on the seven days in

24  question.  The bank did not.

25      77.  After returning from the bank, Plaintiff Amparo Lara

26  and Plaintiff Ken Shirley began interviewing the four Team

27  Leaders who were responsible for running that store in Plaintiff

28  Amparo Lara's absence.  It quickly became apparent that Ms.

1  Ledesma had assumed full responsibility for all bank deposits
2  during Plaintiff Amparo Lara's absence.  Ms. Ledesma had
3  instructed the other two day time Team Leaders not to worry about
4  the bank deposits, saying she would take care of them or words to
5  that effect.

6      78.  Substantial evidence developed that Ms. Ledesma had
7  embezzled the cash instead of depositing it into the appropriate
8  bank account, including that Ms. Ledesma had insisted on assuming
9  control of the bank deposits, the condition of the Daily Deposit
10 Log; the condition of the Daily Red Book; and the condition of
11 the original bank deposit slips coupled with the information
12 obtained in the interviews of the other Team Leaders.

13     79.  Later that same day, on or about June 14, 2006, the
14 Loss Prevention Manager, Kevin Rice, visited Store #5245 and met
15 with Plaintiff Amparo Lara and Plaintiff Ken Shirley.  Plaintiff
16 Ken Shirley showed Mr. Rice what he and Plaintiff Amparo Lara
17 were doing to resolve the situation.  Mr. Rice was comfortable
18 with their efforts and left the task to Plaintiff Ken Shirley and
19 Plaintiff Amparo Lara for the moment.

20     80.  After the meeting with Mr. Rice, Plaintiffs
21 communicated almost daily with each other regarding the missing
22 bank deposits.  However, Amparo Lara heard nothing more from
23 anyone from the corporate office or the Loss Prevention
24 Department about this issue.

25     81.  Plaintiff Amparo Lara is informed, believes, and
26 alleges that on or about June 26, 2006, Mr. Rice and Plaintiff
27 Ken Shirley placed Ms. Ledesma on administrative leave.
28 Plaintiff Amparo Lara believes that Ms. Ledesma was terminated on

1   or about July 10, 2006.

2       82.   On or about July 31, 2006, Region Coach/Regional V.P.,

3   Darren McGilbray and Human Resources Manager, Ipo Hoops, placed

4   Plaintiff Amparo Lara on administrative leave, pending completion

5   of the investigation.

6       83.   On or about August 1, 2006, Plaintiff Amparo Lara

7   received a telephone call from Mrs. Hoops requesting that

8   Plaintiff Amparo Lara meet Mrs. Hoops and Mr. McGilbray at a

9   local restaurant.   When Plaintiff Amparo Lara arrived, Mrs. Hoops

10  began crying.   Both Mrs. Hoops and Mr. McGilbray stated that

11  Plaintiff Amparo Lara had done a good job and that they wished

12  they did not have to fire her, but that they said they had no

13  choice in the matter.

14      84.   The year before Plaintiff Amparo Lara took over the

15  Porterville store, it lost approximately $18,000.   In the first

16  year after Plaintiff Amparo Lara took over the Porterville store,

17  it made money.   Further, at the time of her termination,

18  Plaintiff Amparo Lara was on track to make the Porterville store

19  even more profitable.

20      85.   Additionally, the Porterville store was still having

21  difficulties more than a year after Plaintiff Amparo Lara's

22  termination when Apex Management Company bought the local LJS

23  stores from Yum Brands.   Mike Olson, the Apex District Manager

24  for the district, including the Porterville store, recognized the

25  difficulties the Porterville store was having and heard the

26  stories of Plaintiff Amparo Lara turning that store around;

27  therefore, Mr. Olsen re-hired Plaintiff Amparo Lara and returned

28  her to her former position as manager of the Porterville store,

1  where she continues to excel.

2  IV.  Orders Re Amendments To Pleadings.

3      1.  Defendant has moved to dismiss.  Plaintiffs have no

4  objection to Defendant's motion to dismiss Darren McGilbray,

5  therefore Darren McGilbray is ORDERED DISMISSED as a party from

6  this lawsuit by this scheduling order.

7      2.  Plaintiffs do not intend to add any additional parties

8  at this time.  However, discovery is just beginning and

9  additional individual employees of defendants may be added as

10 parties to this action when their identity is revealed through

11 discovery.

12 V.  Factual Summary.

13     A.  Admitted Facts Which Are Deemed Proven Without Further

14 Proceedings.

15         1.  Plaintiffs are individual residents of the Eastern

16 District of California, Fresno Division.

17         2.  Long John Silver's Inc., is a corporation with its

18 principal place of business in the State of Kentucky and is

19 incorporated in a state other than California.

20         3.  The Defendant has invoked the diversity

21 jurisdiction of the Court.

22         4.  Ken Shirley was employed by Long John Silver's in

23 various capacities over the period of time alleged in the

24 complaint.

25         5.  Plaintiff, Amparo Lara, was also employed by Long

26 John Silver's at various times alleged in the complaint.

27         6.  Both Plaintiffs were terminated from their

28 employment with Long John Silver's August 1, 2006.

1    **7.   At the time of termination. Mr. Shirley was an**
2    **Area Coach for Long John Silver's.**

3    **8.   At the time of her termination, Ms. Lara was a**
4    **restaurant manager at the Porterville Long John Silver's**
5    **restaurant.**

6    **B.   Contested Facts.**

7    **1.   Defendant denies the allegations of Plaintiffs.**
8    **LJS terminated the employment relationship with Plaintiffs as a**
9    **result of cash handling problems that arose at the Porterville**
10   **restaurant, which Plaintiff Lara managed.   Cash handling is**
11   **critical to LJS' business, a matter these Plaintiffs were well**
12   **aware of.   Cash handling concerns had been an on-going, unabated**
13   **issue at the Porterville restaurant for many months.   Plaintiff**
14   **Lara, the restaurant manager, and her supervisor, Plaintiff**
15   **Shirley, had direct responsibility for cash handling at the**
16   **Porterville restaurant.   In particular, Plaintiff Shirley had**
17   **responsibility for training and overseeing that restaurant**
18   **(including its cash handling processes) and its employees and, in**
19   **particular, Plaintiff Lara, who was his direct report.   In short,**
20   **the Plaintiffs jointly bore responsibility for the Porterville**
21   **restaurant's cash handling problems, and thus these terminations**
22   **followed.   These employment terminations occurred in accordance**
23   **with company policy and practice, applied across the board, and**
24   **the terminations took place after lengthy investigation and were**
25   **in no way related to any leave or other time off that Plaintiffs**
26   **may have taken in 2006.   In short, the terminations were not**
27   **motivated by illegal discriminatory motive.**
28   **///**

1    ///

2    VI.   Legal Issues.

3         A.   Uncontested.

4              1.   Jurisdiction exists under 28 U.S.C. § 1332, based

5    on the diverse citizenship of the parties and the amount in

6    controversy.  The supplemental jurisdiction of the Court is

7    invoked under 28 U.S.C. § 1367.

8              2.   Venue is proper under 28 U.S.C. § 1391.

9              3.   The parties agree that the substantive law of the

10   State of California provides the rule of decision in this

11   diversity action.

12             4.   The parties are not in agreement as to whether an

13   arbitration agreement between them compels arbitration as a

14   matter of law.

15        B.   Contested.

16             Plaintiff asserts the following claims:

17             1.   This complaint contains a first cause of action

18   for age discrimination in violation of the California Fair

19   Employment and Housing Act, California Government Code §§ 12900,

20   12921, 12926, 12940, 12941, and 12965 as to Defendant Long John

21   Silver's.

22             2.   A second cause of action for gender, race, color,

23   national origin discrimination in violation of the California

24   Fair Employment and Housing Act, California Government Code

25   §§ 12900, 12921, 12926, 12940, 12941, and 12965 as to Defendant

26   Long John Silver's.

27             3.   A third cause of action for disability

28   discrimination in violation of the California Fair Employment and

1  Housing Act, California Government Code §§ 12900, 12921, 12926,
2  12940, 12941, and 12965, as to all defendants.

3          4.    A fourth cause of action for violation of the
4  California Family Rights Act portion of the California Fair
5  Employment and Housing Act, California Government Code §§ 12900,
6  12921, 12926, 12940, 12941, 12945, 12945.2 and 12965, as to all
7  defendants.

8          5.    A fifth cause of action for failure to engage in
9  interactive process portion of the California Fair Employment and
10 Housing Act, California Government Code §§ 12900, 12921, 12926,
11 12940, 12941, and 12965, as to Defendant Long John Silvers.

12         6.    A sixth cause of action for failure to provide
13 reasonable accommodations in violation of the California Fair
14 Employment and Housing Act, California Government Code §§ 12900,
15 12921, 12926, 12940, 12941, and 12965, as to Defendant Long John
16 Silver's.

17         7.    A seventh cause of action for racial/color/
18 gender/disability/age harassment in violation of the California
19 Fair Employment and Housing Act, California Government Code
20 §§ 12900, 12921, 12926, 12940, 12941, and 12965, as to all
21 defendants.

22         8.    An eighth cause of action for failure to take all
23 reasonable steps to prevent discrimination and retaliation in
24 violation of the California Fair Employment and Housing Act,
25 California Government Code §§ 12900, 12921, 12926, 12940, 12941,
26 and 12965, as to defendant Long John Silver's.

27         9.    A ninth cause of action for retaliation for
28 complaints and protestation of discrimination in violation of the

31

1  California Fair Employment and Housing Act, California Government

2  Code §§ 12900, 12921, 12926, 12940, 12941, and 12965, as to

3  defendant Long John Silver's.

4      10.  A tenth cause of action for retaliation under the

5  California Family Rights Act portion of the California Fair

6  Employment and Housing Act, California Government Code §§ 12900,

7  12921, 12926, 12940, 12941, and 12965, as to defendant Long John

8  Silver's.

9      **Defendant's**

10     1.  Defendant denies all the charging allegations by

11 Plaintiffs.  Defendant specifically notes that Mr. McGilbray has

12 never been served with this lawsuit, to Defendant LJS's

13 knowledge.  Accordingly, the only known Defendant that is a

14 served party is LJS, which is represented by Ms. Johnson and Mr.

15 Spallas.  Additionally, Defendant notes that Plaintiffs are

16 subject to mandatory arbitration, and Defendant will file a

17 motion to compel arbitration.  Defendant asserts that it acted in

18 good faith, without malice or intentional discrimination at all

19 times, and that certain of Plaintiff's claims are subject to

20 dismissal for failure to state a claim upon which relief may be

21 granted (for example, Plaintiff's harassment and retaliation

22 claims).  Defendant further asserts that Plaintiffs failed to

23 mitigate their damages.

24 VII. Consent to Magistrate Judge Jurisdiction.

25     1.  The parties have not consented to transfer the

26 case to the Magistrate Judge for all purposes, including trial.

27 VIII.    Corporate Identification Statement.

28     1.  Any nongovernmental corporate party to any action in

**32**

1  this court shall file a statement identifying all its parent

2  corporations and listing any entity that owns 10% or more of the

3  party's equity securities.  A party shall file the statement with

4  its initial pleading filed in this court and shall supplement the

5  statement within a reasonable time of any change in the

6  information.

7  IX.  Discovery Plan and Cut-Off Date.

8       1.   The parties agree that the disclosures required under

9  Fed. R. Civ. P. 26(a) will be provided to each other no later

10 than 28 days after the Scheduling Conference, or March 4, 2009.

11      2.   No changes are currently proposed as to limitations on

12 discovery imposed under Fed. R. Civ. P. 30, 31, and/or 33.

13      3.   The parties believe that discovery will be needed on

14 the nature and extent of plaintiffs' damages.  Discovery will

15 also be needed concerning the facts that gave rise to the lawsuit

16 including, but not limited to, testimony from employees of

17 defendants who have percipient knowledge as to the policy and

18 procedure of Long John Silver's banking and cash handling

19 procedures, and supervision regarding these policies.

20      4.   The parties are ordered to complete all non-expert

21 discovery on or before March 5, 2010.

22      5.   The parties are directed to disclose all expert

23 witnesses, in writing, on or before December 1, 2009.  Any

24 rebuttal or supplemental expert disclosures will be made on or

25 before January 15, 2010.  The parties will comply with the

26 provisions of Federal Rule of Civil Procedure 26(a)(2) regarding

27 their expert designations.  Local Rule 16-240(a) notwithstanding,

28 the written designation of experts shall be made pursuant to F.

1  R. Civ. P. Rule 26(a)(2), (A) and (B) and shall include all

2  information required thereunder.  Failure to designate experts in

3  compliance with this order may result in the Court excluding the

4  testimony or other evidence offered through such experts that are

5  not disclosed pursuant to this order.

6      6.    The parties are ordered to complete all discovery,

7  including experts, on or before March 5, 2010.

8      7.    The provisions of F. R. Civ. P. 26(b)(4) shall

9  apply to all discovery relating to experts and their opinions.

10  Experts may be fully prepared to be examined on all subjects and

11  opinions included in the designation.  Failure to comply will

12  result in the imposition of sanctions.

13  X.    Pre-Trial Motion Schedule.

14      1.    All Non-Dispositive Pre-Trial Motions, including any

15  discovery motions, will be filed on or before March 19, 2010, and

16  heard on April 23, 2010, at 9:00 a.m. before Magistrate Judge

17  Sandra M. Snyder in Courtroom 7.

18      2.    In scheduling such motions, the Magistrate

19  Judge may grant applications for an order shortening time

20  pursuant to Local Rule 142(d).  However, if counsel does not

21  obtain an order shortening time, the notice of motion must comply

22  with Local Rule 251.

23      3.    All Dispositive Pre-Trial Motions are to be

24  filed no later than April 5, 2010.  Plaintiffs shall have thirty

25  (30) days to respond, through and including May 5, 2009, and

26  those motions will be heard on June 7, 2010, at 10:00 a.m. before

27  the Honorable Oliver W. Wanger, United States District Judge, in

28  Courtroom 3, 7th Floor.  In scheduling such motions, counsel

1  shall comply with Local Rule 230.

2  XI.   Pre-Trial Conference Date.

3       1.    July 12, 2010, at 11:00 a.m. in Courtroom 3, 7th Floor,

4  before the Honorable Oliver W. Wanger, United States District

5  Judge.

6       2.    The parties are ordered to file a Joint Pre-

7  Trial Statement pursuant to Local Rule 281(a)(2).

8       3.    Counsel's attention is directed to Rules 281

9  and 282 of the Local Rules of Practice for the Eastern District

10 of California, as to the obligations of counsel in preparing for

11 the pre-trial conference.  The Court will insist upon strict

12 compliance with those rules.

13 XII. Motions - Hard Copy.

14      1.    The parties shall submit one (1) courtesy paper copy to

15 the Court of any motions filed that exceed ten pages and any

16 motions that have exhibits attached.  Exhibits shall be marked

17 with protruding numbered or lettered tabs so that the Court can

18 easily identify such exhibits.

19 XIII.  Trial Date.

20      1.    August 24, 2010, at the hour of 9:00 a.m. in Courtroom

21 3, 7th Floor, before the Honorable Oliver W. Wanger, United

22 States District Judge.

23      2.    This is a jury trial.

24      3.    Counsels' Estimate Of Trial Time:

25            a.   7-10 days.

26      4.    Counsels' attention is directed to Local Rules

27 of Practice for the Eastern District of California, Rule 285.

28 XIV. Settlement Conference.

35

1      1.    A Settlement Conference is scheduled for March 17,

2  2010, at 10:00 a.m. in Courtroom 7 before the Honorable Sandra M.

3  Snyder, United States Magistrate Judge.

4      2.    Unless otherwise permitted in advance by the

5  Court, the attorneys who will try the case shall appear at the

6  Settlement Conference with the parties and the person or persons

7  having full authority to negotiate and settle the case on any

8  terms at the conference.

9      3.    Permission for a party [not attorney] to attend

10 by telephone may be granted upon request, by letter, with a copy

11 to the other parties, if the party [not attorney] lives and works

12 outside the Eastern District of California, and attendance in

13 person would constitute a hardship.  If telephone attendance is

14 allowed, the party must be immediately available throughout the

15 conference until excused regardless of time zone differences.

16 Any other special arrangements desired in cases where settlement

17 authority rests with a governing body, shall also be proposed in

18 advance by letter copied to all other parties.

19     4.    Confidential Settlement Conference Statement.

20 At least five (5) days prior to the Settlement Conference the

21 parties shall submit, directly to the Magistrate Judge's

22 chambers, a confidential settlement conference statement.  The

23 statement should not be filed with the Clerk of the Court nor

24 served on any other party.  Each statement shall be clearly

25 marked "confidential" with the date and time of the Settlement

26 Conference indicated prominently thereon.  Counsel are urged to

27 request the return of their statements if settlement is not

28 achieved and if such a request is not made the Court will dispose

1  of the statement.

2      5.   The Confidential Settlement Conference
3  Statement shall include the following:

4         a.   A brief statement of the facts of the
5  case.

6         b.   A brief statement of the claims and
7  defenses, i.e., statutory or other grounds upon which the claims
8  are founded; a forthright evaluation of the parties' likelihood
9  of prevailing on the claims and defenses; and a description of
10 the major issues in dispute.

11        c.   A summary of the proceedings to date.

12        d.   An estimate of the cost and time to be
13 expended for further discovery, pre-trial and trial.

14        e.   The relief sought.

15        f.   The parties' position on settlement,
16 including present demands and offers and a history of past
17 settlement discussions, offers and demands.

18 XV.   Request For Bifurcation, Appointment Of Special Master,
19 Or Other Techniques To Shorten Trial.

20     1.   Any requests shall be addressed by non-dispositive
21 motion.  In the event punitive damages are sought, the amount of
22 punitive damages, if any, shall be tried in a second phase in a
23 continuous trial before the same jury after liability and the
24 entitlement to punitive damages has been established in the first
25 phase.

26 XVI. Related Matters Pending.

27     1.   There are no related matters.

28 XVII.    Compliance With Federal Procedure.

1     1.    The Court requires compliance with the Federal

2    Rules of Civil Procedure and the Local Rules of Practice for the

3    Eastern District of California.   To aid the court in the

4    efficient administration of this case, all counsel are directed

5    to familiarize themselves with the Federal Rules of Civil

6    Procedure and the Local Rules of Practice of the Eastern District

7    of California, and keep abreast of any amendments thereto.

8    XVIII.    Effect Of This Order.

9     1.    The foregoing order represents the best

10   estimate of the court and counsel as to the agenda most suitable

11   to bring this case to resolution.   The trial date reserved is

12   specifically reserved for this case.   If the parties determine at

13   any time that the schedule outlined in this order cannot be met,

14   counsel are ordered to notify the court immediately of that fact

15   so that adjustments may be made, either by stipulation or by

16   subsequent scheduling conference.

17    2.    Stipulations extending the deadlines contained

18   herein will not be considered unless they are accompanied by

19   affidavits or declarations, and where appropriate attached

20   exhibits, which establish good cause for granting the relief

21   requested.

22    3.    Failure to comply with this order may result in

23   the imposition of sanctions.

24

25   IT IS SO ORDERED.

26   Dated:   February 6, 2009            /s/ Oliver W. Wanger
                                       UNITED STATES DISTRICT JUDGE
27

28